## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |
|---|---|
| NICHOLAS BLANCHARD, | : |
| Plaintiff, | : : : |
| v. | : Case No. : |
| AUGUSTA BOARD OF EDUCATION; MARTHA WITHAM, Chair, Augusta Board of Education, in her official and individual capacities; and AUGUSTA SCHOOL DEPARTMENT; | : : : : : : |
| Defendants. | : : : |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

### INTRODUCTION

As a frequent speaker at Augusta Board of Education meetings, Nicholas Blanchard expects that other attendees may vigorously disagree with his comments and oppose his views in their own statements. But Blanchard has also come to expect something else: that Martha Witham, the school board's Chair, will interrupt and bar him from saying anything she dislikes. Over the past year, the Board of Education has repeatedly prevented Blanchard from delivering his public comments by censoring his criticism and even threatening to have him forcibly removed.

Although the Board of Education invites the public to express their opinions and concerns about educational matters, they make it almost impossible to do so, except for speakers who wish to fawningly compliment the board or school officials. The

Board of Education's policy and practices ban commenters from saying anything "abusive," "vulgar," "defamatory," "disparaging," "offensive," "rude," "gossip[y]," or even just "negative" (at least, if the negativity concerns a school employee or the board itself). In the last year, Witham has prevented Blanchard from calling his political opponents "beta males" and "cult" members, formally petitioning for firing of a high-level administrator, criticizing board members for chronic absenteeism and unlawful votes, and once evidently just for using a board member's first name.

The school board's vague, discriminatory, and unreasonable policies violate the First Amendment. The Board of Education cannot open its meetings for public comment and then censor those who express their positions using words and rhetoric the school board dislikes. It cannot selectively enforce unreasonable restrictions against members' harshest critics in order to intimidate and bully citizens into either praising the board or keeping silent. This Court should declare Defendants' speech restrictions unconstitutional, enjoin them from enforcing these policies and practice in the future, and award Blanchard nominal damages to vindicate his constitutional rights.

## THE PARTIES

1.      Plaintiff Nicholas Blanchard is a natural person, a resident of Augusta, in Kennebec County, and a citizen of Maine and the United States of America.

2.      Defendant Augusta Board of Education is a Maine school board, consisting of nine elected members and a student representative. It is the governing body of the Augusta School Department.

2

3.     Defendant Martha Witham is the Chair of the Augusta Board of Education and has held that position at all times relevant to the events in this complaint. She is sued in her official and individual capacities.

4.     Defendant Augusta School Department is a Maine school administrative district serving the public schools in the city of Augusta, Maine. It is governed by the Augusta Board of Education.

JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claims arise under federal law and challenge Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

6.     Venue lies in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and are occurring in this judicial district and all Defendants reside in this district.

STATEMENT OF FACTS

*Augusta Board of Education's Policies on Public Comments*

7.     Under Maine law, "[a] school board shall provide the opportunity for the public to comment on school and education matters at a school board meeting. Nothing in this subsection restricts the school board from establishing reasonable standards for the public comment period, including time limits and conduct standards." 20-A M.R.S. § 1001(20).

8.     The Board of Education (the governing body of the Augusta School Department) holds a monthly business meeting on the second Wednesday of the month. Each meeting features a time period for public comment

9.     The Board of Education maintains a written policy, Policy BEDH, that regulates "Public Participation at Board Meetings."

10.     Exhibit A is a true and correct copy of Policy BEDH, as of January 5, 2026. Policy BEDH is also available on the school district's website at https://www.augustaschools.org/documents/board-of-education/adopted-policies/b.-school-board-governance-%26-operations/516266.

11.     Under Policy BEDH, "[a]ll meetings of the Augusta Board of Education are open to the public," and "the Board will provide appropriate opportunities at its meetings for members of the public to express opinions and concerns related to the matters concerning education and the Augusta Board of Education schools."

12.     Under Policy BEDH, during public comments at meetings, "members of the public may speak on any subject directly related to the operations of the schools, except for personal matters or complaints concerning specific employees or students."

13.     Under Policy BEDH, the board's "Chair shall be responsible for maintaining proper order and compliance with these guidelines." "The Chair has the authority to stop any presentation that violates these guidelines or the privacy rights of others." Indeed, "[p]ersons who disrupt the meeting may be asked to leave,

and the Chair may request law enforcement assistance as necessary to restore order."

14.     Although Policy BEDH does not establish a fixed amount of time that each public commenter can speak, "[t]he Chair may limit the time allotted for comments on a particular topic as well as the time each individual may speak."

15.     Policy BEDH also states that "[s]peakers are not permitted to share gossip, make defamatory comments, or use abusive or vulgar language." Moreover, "[n]o complaints or allegations will be allowed at Board meetings concerning any person employed by the school system or against particular students. Personal matters or complaints concerning student or staff issues will not be considered in a public meeting but will be referred through established policies and procedures."

16.     The Board of Education maintains a written policy, Policy KE, that regulates "Public Concerns and Complaints."

17.     Exhibit B is a true and correct copy of Policy KE, as of January 5, 2026. Policy KE is also available on the school district's website at https://www.augustaschools.org/documents/board-of-education/adopted-policies/k.-school%2Fcommunity-relations/23017168

18.     Policy KE states that "[p]arents, students or other citizens with complaints or concerns regarding any aspect of the Augusta School Department or an employee thereof shall be encouraged to seek a resolution at the lowest possible level." Policy KE makes an "exception[]" for "complaints that concern Board actions or operations. Such complaints should be addressed to the Board Chair."

19.     Policy BEDH specifically refers speakers to Policy KE, to use for making complaints concerning any person employed by the school system or against particular students.

*The Board Chair's Statements Interpreting Policy BEDH*

20.     At the start of the public comment period during each Board of Education business meeting, the board's Chair, Defendant Martha Witham, reviews the requirements of Policy BEDH and states the amount of time each commenter can speak.

21.     The amount of time that each commenter can speak varies from meeting to meeting. Between January 8, 2025, and November 12, 2025, the Board of Education held eleven business meetings. At these eleven meetings, the time limit was never less than two minutes per speaker or more than five minutes per speaker.

22.     At the July 9, 2025, meeting, Witham not only reviewed Policy BEDH at the start of the public comments period, but also read a statement explaining Policy BEDH.

23.     In this statement, Witham defined "exactly what" two terms in Policy BEDH mean, by reading definitions from Merriam-Webster Dictionary. According to Witham, "a defamatory statement" is a statement "that can injure one's reputation." "Abusive" language is "language that is harmful or offensive to a person."

24.     Video recordings of all business meetings are available at a website managed by the school district, at https://vimeo.com/showcase/augustaschoolboard. Witham's explanation of Policy BEDH during the July 9 meeting is at https://vimeo.com/showcase/augustaschoolboard?video=1092644647, between time stamps 1:34:22 and 1:38:08.

25.     Two months earlier, during the May 14, 2025, meeting, members of the board had a dispute about whether Witham was enforcing Policy BEDH correctly. This dispute began after a public commenter made statements that at least one board member, Kati McCormick, viewed as criticizing that board member.

26.     A video recording of this dispute among the board members is at https://vimeo.com/showcase/augustaschoolboard?video=1074124806, between 2:03:52 and 2:10:16.

27.     During this dispute, board member Charles Hicks stated that "the policy is that we will not speak positively or negatively about any school personnel." Witham responded, "No, no, that is not the policy at this time." Witham clarified that the policy "is only that we won't speak negatively."

28.     After McCormick noted that Policy BEDH does not mention "negativity" but only refers to "defamatory comments" and "abusive or vulgar language," Witham stated that this terminological distinction is "just mincing words on that."

29.     At the close of this dispute, Witham stated, "the Chair will do her job," and she then instructed the public commenter whose speech has incited this dispute to keep future comments "non-negatory."

*Plaintiff's Public Comments at Board of Education Meetings*

30.     Plaintiff Nicholas Blanchard attended and delivered public comments at every business meeting of the Board of Education between January 8, 2025, and November 12, 2025.

31.     Blanchard first gave public comments at the January 8, 2025, meeting.

32.     At the January meeting, the Board of Education discussed amending its discrimination and harassment policies regarding gender identity. Under the proposed revisions, a student could be disciplined for speaking out against transgender students' use of locker rooms and bathrooms that did not match their biological sex.

33.     Blanchard opposed the policy changes in his public comments. During these comments, he referred to male board members who supported the changes as "soft beta males who won't stand up for what is right," stating that they failed to protect safe sex-segregated facilities for biological females.

34.     Witham interrupted Blanchard's comments immediately after the reference to "soft beta males." Witham stated, "I am sorry, but disparaging remarks are not allowed."

35.     Blanchard responded, "OK," and finished the remainder of his comments without additional interruption. To prevent future interruptions, Blanchard avoided remarks that he believed could be construed as disparaging.

36.    Blanchard's January 8 comments are at
https://vimeo.com/showcase/augustaschoolboard?video=1038397320, between time
stamps 49:18 and 52:08.

37.    On February 12, 2025, Blanchard's comments included an
acknowledgement that the president of the Maine Principals' Association (MPA)
was physically present in the room.

38.    Shortly before the February board meeting, the MPA had issued a public
statement confirming that the MPA would allow transgender athletes to compete in
sports that do not match their biological sex (despite President Trump's executive
order forbidding such participation).

39.    In February 2025, MPA President Kim Liscomb was also the principal of
Cony Middle and High School in Augusta. Blanchard referred to the president of the
MPA and pointed his finger in Liscomb's direction. However, he did not use
Liscomb's name during his February comments or mention that Liscomb was
principal of a local high school.

40.    In his February public comments, Blanchard warned that the MPA's
actions would cause Maine public schools to lose federal funding.

41.    After Blanchard warned of this funding threat, Witham then interrupted
and said, "Excuse me, no disparaging remarks. They are not allowed."

42.    Blanchard objected that nothing that he had said was disparaging.
Nonetheless, Witham answered that "those remarks are inappropriate; I am sorry."
According to Witham, "We aren't accepting any comments about our personnel."

43.    Blanchard tried to continue speaking after this interruption. The Board of Education, however, voted to go into recess, which ended his comments.

44.    Blanchard's February 12 comments are at https://vimeo.com/showcase/augustaschoolboard?video=1055408924, between 1:37:40 and 1:43:35.

45.    Blanchard spoke at the March 12 meeting without interruption or incident. During his March 12 remarks, Blanchard again discussed the threat to federal funding and criticized the MPA for its position. But these March comments did not mention MPA President Liscomb, either by name or by position.

46.    In Blanchard's comments at the April 9, 2025, meeting, he thanked the six board members who had voted the previous month for Augusta schools to comply with Title IX's rules regarding transgender athletics. He also criticized the one board member who voted against compliance without using that board member's name.

47.    At that point, Witham interrupted to say, "I am sorry, but negative comments will not be allowed." As a result, Blanchard moved onto another topic.

48.    Blanchard next discussed how he was gathering signatures on a formal petition. This petition asked the Board of Education to vote to fire Liscomb from her job as principal of Cony Middle and High School because of her actions as president of the MPA.

49.    Witham again interrupted and stated, "I am sorry, that is not going to be tolerated." After Blanchard stressed that Liscomb is a public figure (not just a

school employee), Witham repeated her warning and ordered him to stop talking: "Nope, I am sorry, it will not be tolerated. I am going to ask you to step from the podium. That's the second warning I am going to give you about making defamatory remarks about school personnel."

50.    Blanchard asked Witham to clarify how his comment was defamatory. Witham did not explain but stated that she was "not going to allow [Blanchard] to speak to school personnel in any way" and that "these comments will not be tolerated at the meeting, directed to us or anybody else in this room." According to Witham, "It was involving an employee" and "will not be tolerated."

51.    Blanchard again tried to speak about the petition, referring only to "the president of the Maine Principals' Association," instead of using Liscomb's name. Witham interrupted and said, "Nope, close enough—you're done, Mr. Blanchard. You're done, Mr. Blanchard."

52.    Although Blanchard had approximately three minutes remaining in his five-minute time allotment, he was not allowed to finish his comments.

53.    Blanchard's April 9 comments are at https://vimeo.com/showcase/augustaschoolboard?video=1069039362, between 46:05 and 48:20.

54.    At the May 14, 2025, meeting, Blanchard did not deliver traditional comments. Instead, he stood at the podium with his mouth taped. The words "I can't speak" were written on the tape on his mouth.

55.     While standing at the podium, Blanchard played a recording of a previously prepared statement that he had written about the First Amendment. The computer program playing this recording read it in the voice of President Trump, but the recording explicitly identified Blanchard by name as the author of the recording's words.

56.     Witham interrupted to say that Blanchard must speak in his own voice, or she would have him removed. In response, Blanchard left the podium and placed a flag of the People's Republic of China on Witham's desk. The board then voted to go into recess, without allowing Blanchard to complete his comments.

57.     Blanchard's May 14 comments are at https://vimeo.com/showcase/augustaschoolboard?video=1074124806, between 1:29:15 to 1:30:52.

58.     At the June 11, 2025, meeting, Blanchard addressed how the board had repeatedly censored his public comments in past meetings.

59.     Blanchard stated that the Board was selectively enforcing its policies, by allowing speakers with views opposed to Blanchard's to make disparaging remarks about specific people—including about Blanchard personally.

60.     Notably, Blanchard pointed out that one speaker, Jennifer Carran of Falmouth, had criticized Blanchard explicitly during her comments at both the April and the May meetings. Both times, the board permitted this speaker to talk for the entirety of her minutes. Indeed, in April, one board member even applauded at the end of that speaker's remarks.

61.    Next, Blanchard criticized the Board of Education itself, claiming that the board placed ideology over academic excellence. Blanchard insisted that "we are done watching the alphabet cult shove its propaganda down our throat and in our schools."

62.    Witham interrupted to state, "Please refrain from disparaging remarks." She refused to explain what made his remarks disparaging.

63.    When the buzzer sounded, signaling that Blanchard's time to speak was up, Witham ordered Blanchard to step away from podium. Blanchard protested that his time was only up because Witham had used up half of his speaking time to interrupt him.

64.    Witham then told an officer to remove Blanchard. To avoid getting removed by the officer or even arrested, Blanchard stepped away from the podium and left the room.

65.    Blanchard's June 11 comments are at https://vimeo.com/showcase/augustaschoolboard?video=1084472398, between 2:43:43 to 2:48:08.

66.    Before Blanchard's July 9, 2025, comments began, Witham addressed Blanchard directly. She told Blanchard to follow the law and Policy BEDH during his comments and to confine himself to talking about "education and the Augusta schools, as required."

67. Blanchard then devoted most of his July comments to explaining that the Board of Education was violating the First Amendment through the way it handled public comments. The board permitted these comments.

68. Shortly before the end of his comment period, Blanchard shifted topics and criticized a board member for rarely attending meetings. At that, Chair Witham interrupted and said, "Excuse me, but we are not going to do derogatory comments to individuals." Blanchard left the podium a few seconds later because his time ended.

69. Blanchard's July 9 comments are at https://vimeo.com/showcase/augustaschoolboard?video=1092644647, between 1:38:18 to 1:43:03.

70. During his August 13, 2025, comments, Blanchard began by noting that Board of Education members are not hired by the school district and thus do not qualify as "employees" under Policy BEDH.

71. Blanchard then focused his speech on criticizing the Board of Education itself for enforcing Policy BEDH selectively. Blanchard stated that the board only prevents negative comments by people opposed to the school board's political positions. Blanchard noted that Carran had repeatedly criticized him personally, but her remarks were not treated as defamatory.

72. Blanchard then compared the board to communists and referred to school board member Susan Parks by name, stating, "That's why a communist Chinese

flag was put on the podium over there, Ms. Susan." Witham interrupted to say,
"Excuse me, but we are not going to have rude comments either."

73.    Blanchard finished his comments using the remainder of his time without
further interruption.

74.    Blanchard's August 13 comments are at
https://vimeo.com/showcase/augustaschoolboard?video=1100157502, between
1:40:02 and 1:44:10.

75.    On September 10, 2025, Blanchard's comments concentrated on a letter
that the Foundation for Individual Rights and Expression (FIRE) sent to the Board
of Education on September 8, which outlined constitutional problems with Policy
BEDH. Blanchard warned the board that it would eventually be sued unless it
changed its policy and practices.

76.    Exhibit C is a true and correct copy of FIRE's September letter, as of
January 5, 2026. This letter is also available on FIRE's website at
https://www.thefire.org/research-learn/fire-letter-augusta-schools-policy-committee-
september-8-2025.

77.    In November, FIRE provided the board with a version of Policy BEDH
containing recommended changes. Exhibit D is a true and correct copy of FIRE's
recommended changes, as of January 5, 2026. This document is also available on
the school district's website at https://www.thefire.org/research-learn/fire-suggested-
edits-and-explanation-letter-augusta-schools-november-17-2025.

78.     Blanchard was permitted to complete his September 10 comments without interruption. Blanchard later spoke at two more meetings (on October 10 and November 12), without interruption.

79.     The Board of Education's December 10, 2025, meeting was canceled. As a result, the board did not hold a business meeting during the month of December.

*The Impact of Defendants' Actions on Plaintiff*

80.     Blanchard intends to publicly comment at future Board of Education meetings in order to express his opposition to the school district's transgender policies; to criticize the board and individual members for their violation of First Amendment rights; to criticize the board and the school district about curricular and budgetary matters; and to petition the board to fire Kim Liscomb or other employees who he claims have promoted unlawful policies.

81.     In his future public comments, Blanchard wishes and intends to express himself in the same way that he did previously, using words and phrases that the board may find negative, defamatory, derogatory, disparaging, abusive, gossipy, vulgar, or rude.

82.     Blanchard intends to refer to board members and to school employees by name or by position. Although he does not intend to bring formal complaints under Policy KE about school employees at board meetings, Blanchard does intend to criticize employees and board members when that criticism is relevant to the school matter under discussion or to a petition being presented.

83.    Blanchard also wants to criticize the school board's public comment policy and its past treatment of him. He believes that Policy BEDH violates the First Amendment and hypocritically allows the board to silence dissenters while authorizing negative comments by speakers who agree with the board. He intends to criticize the board's policy and practices regarding policy comments using words the board may find negative, disparaging, and "defamatory" (even if not defamatory under the law).

84.    Blanchard believes, however, that for the foreseeable future, Witham and the Board of Education will not permit him to express his views using the language that he wishes to use, because they judge his comments to violate provisions of Policy BEDH. Blanchard believes that, if he were to speak again in the manner that he wishes, Defendants would again interrupt him, prohibit him from speaking, threaten him with removal, and declare his time forfeited for violating Policy BEDH.

85.    In order to speak again without interruption, Blanchard believes that he would need to self-censor and avoid anything that could be characterized as negative.

86.    Blanchard finds it frustrating and degrading to have his comments interrupted and sometimes cut short, as they have been in the past, especially because other speakers are allowed to promote their viewpoints using negative language.

87.    Although Blanchard continues to publicly comment about school issues, at times Policy BEDH and the board's selective enforcement of that policy impact his choice of words, the viewpoints he discusses, and the frequency and length of his comments. To avoid interruption and removal in the future, Blanchard has refrained from commenting at board meetings using fully the language and rhetoric that he wishes to use because of the threat that the board will interrupt him, cut short his time, and have him removed.

88.    Unless Blanchard is able to obtain protection from the Court, he expects that he will not speak about Augusta's transgender policies and these other matters using the language that he would choose at future Board of Education meetings.

COUNT ONE
VIEWPOINT DISCRIMINATION, FACIALLY AND AS APPLIED
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

89.    Plaintiff realleges and incorporates by reference paragraphs 1 through 88.

90.    The public-comment period at Defendant Augusta Board of Education's business meetings constitutes a limited public forum for private speech by the general public because state law requires school boards to provide an opportunity for the public to comment on school and education matters at meetings, and the board has opened its meetings to the public and permitted people to express their opinions and concerns regarding educational and school-related matters. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983); *Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks &*

*Rec.*, 311 F.3d 534, 545 (2d Cir. 2002); *McBreairty v. Sch. Bd. of RSU22*, 616 F.

Supp. 3d 79, 92-93 & n.13 (D. Me. 2022) (collecting cases).

91. "Under the . . . First Amendment . . . government may not grant the use of a

forum to people whose views it finds acceptable, but deny use to those wishing to

express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*,

408 U.S. 92, 96 (1972). "Once it has opened a limited forum . . . the State must

respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of*

*the Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal quotation marks and citations

omitted).

92. "[I]n a limited public forum, government '[c]ontrol over access to [the] forum

can be based on subject matter and speaker identity so long as the distinctions

drawn are reasonable in light of the purpose served by the forum and are viewpoint

neutral.'" *McBreairty*, 616 F. Supp. 3d at 93 (quoting *Cornelius v. NAACP Legal Def.*

*& Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

93. The same rules apply if the Board of Education's public comment periods

are deemed nonpublic fora. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11-12 (2018).

The First Circuit treats "limited public forum" and "nonpublic forum" as synonyms.

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 n.4 (1st Cir. 2004) (citing cases);

*see also Curnin v. Town of Egremont*, 510 F.3d 24, 28 (1st Cir. 2007). Regulations

restricting First Amendment expression in a nonpublic forum "must still be both

viewpoint neutral and reasonable to be constitutional." *Del Gallo v. Parent*, 557

F.3d 58, 72 (1st Cir. 2009).

19

94.   "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion). Allegations of hurt feelings, real or spurious, do not justify censorship of public comments. "Restrictions that bar offensive or otherwise unwelcome speech are impermissible, regardless of the forum in which the government seeks to impose them." *Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 1334 (11th Cir. 2024).

95.   Defendants' Policy BEDH facially discriminates based on viewpoint. It bans comments the board deems to be "abusive," "vulgar," "gossip," "defamatory," or a "complaint or allegation" about school employees. Moreover, Defendants have interpreted this policy and applied it at public meetings to speech that is "disparaging," "derogatory" to individuals, "injur[ious to] one's reputation," "rude," "harmful," "offensive," or "negative" about school personnel.

96.   "The facial viewpoint bias in [the policy] results in viewpoint-discriminatory application." *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019). Defendants do not prohibit public commenters from expressing all viewpoints on topics such as transgender policies, the board's own actions, or the performance of school employees. By singling out those whose comments on the topic are deemed abusive, offensive, or negative, Defendants have applied their policies in a way that discriminates based on viewpoint in violation of the First Amendment.

97.   Defendants have also selectively enforced Policy BEDH in a viewpoint discriminatory manner. Defendants have applied these policies in a way that allows them to prevent public comments with content or rhetorical style they dislike, or which offends the board. Commenters praising the board or school employees or promoting inclusive policies on gender identity are allowed to make disparaging remarks about individuals, but commenters expressing opposing viewpoints in a negative way are interrupted and ordered to stop.

98.   By enforcing Provisions E, H, and J of Policy BEDH, Defendants, under color of law, deprived and continue to deprive Plaintiff of his rights to freedom of speech and freedom of petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and is entitled to damages; declaratory relief; a permanent injunction against continued enforcement of Defendants' unconstitutional policy; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TWO
UNREASONABLE RESTRICTION, FACIALLY AND AS-APPLIED
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

99.   Plaintiff realleges and incorporates by reference paragraphs 1 through 88.

100.   In both a limited public forum and a nonpublic forum, government restrictions on speech and petition must be "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806. In a forum designed for "constructive dialogue through the public's comments," reasonableness is "necessarily a more demanding test than in forums that have a primary purpose

that is less compatible with expressive activity." *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 636 (D.C. Cir. 2024) (internal quotation marks omitted).

101. A speech restriction is unreasonable when it is incapable of reasoned application, lacks sufficient implementation guidance, and obstructs the purposes of the limited public forum. *See, e.g.*, *Moms for Liberty*, 118 F.4th at 1328, 1337; *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 497 (6th Cir. 2020).

102. Defendants' ban on comments containing "gossip," "abusive or vulgar language," "complaints or allegations," or "personal matters" concerning school employees or staff, and speech violating "the privacy rights of others" are unreasonable because these terms lack an objective standard for "distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16. It is also unreasonable for Defendants to prevent commenters from referring to board members or school employees when their actions or personal information are relevant to a specific agenda item or other school district matters under discussion at the meeting.

103. Defendants have enforced this ban haphazardly, allowing positive personally directed statements about school employees while preventing speakers even from criticizing board members themselves for actions that members took in public in their capacity as elected officials. Defendants' application of its policy

22

obstructs the forum's purpose of allowing the board to hear the public's opinions and concerns about school and education matters at meetings.

104. By unreasonably restricting public comment at school board meetings, Defendants, under color of law, deprived and continue to deprive Plaintiff of his rights to freedom of speech and freedom of petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and is entitled to damages; declaratory relief; a permanent injunction against continued enforcement of Defendants' unconstitutional policy; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT THREE
VAGUENESS
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

105. Plaintiff realleges and incorporates by reference paragraphs 1 through 88.

106. The First and Fourteenth Amendments prohibit vague laws that chill protected speech. A law can be "impermissibly vague for either of two independent reasons" under the First Amendment. *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citation omitted). "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.*

107.  Defendants' prohibition of comments that the board deems to be "abusive," "vulgar," "gossip," a "complaint[] or allegation[]" or "personal matter[]" concerning school employees or staff, or speech violating "the privacy rights of others" is unduly vague, lacks any objective standard for or definition of key terms such as "gossip,"

"complaint," or "personal," and is inherently subjective, serving only to authorize Defendants' arbitrary censorship of speech they dislike. This policy is unconstitutionally vague and gives excessive enforcement discretion to school leaders. *Cf. Mansky*, 585 U.S. at 21–22.

108.    Although Defendant Witham has defined two key terms ("defamatory" and "abusive") in a public statement delivered during a board meeting, these definitions themselves contained vague and broad language that gave no notice to the audience about what is prohibited and encouraged arbitrary enforcement.

109.    By enforcing this policy, Defendants, under color of law, deprived and continue to deprive Plaintiff of his rights to freedom of speech and freedom of petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and is entitled to damages; declaratory relief; a permanent injunction against continued enforcement of Defendants' unconstitutional policy; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FOUR
OVERBREADTH
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

110. Plaintiff realleges and incorporates by reference paragraphs 1 through 88.

111. Speech regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or

partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal quotation marks and citations omitted) (emphasis original).

112.    Provisions E, H, and J of Defendants' Policy BEDH empower Defendants to censor any speech they subjectively consider offensive, negative, personal, or rude. The policy is not confined to prohibiting unprotected speech, such as true threats or defamation under its well-established legal definition. Rather, the policy bans all comments that the Board finds offensive, negative, personal, or rude, even when the comments are protected speech about matters relevant to the purpose of the forum.

113.    Defendants' policy violates the First Amendment right of free speech on its face because it is substantially overbroad, sweeping in vast amounts of protected political expression.

114.    By enforcing this policy, Defendants, under color of law, deprived and continue to deprive Plaintiff of his rights to freedom of speech and freedom of petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and is entitled to damages; declaratory relief; a permanent injunction against continued enforcement of Defendants' unconstitutional policy; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

1. Issue orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from:

   a. Enforcing Provisions E, H, and J of Policy BEDH, or any substantially similar future revision of Policy BEDH, against public commenters at Augusta Board of Education meetings who are expressing viewpoints on school and education matters; and

   b. Enforcing any provision of Policy BEDH, or any future revision thereto, selectively against a particular viewpoint but not against other viewpoints; and

   c. Discriminating against speech or petitioning at Augusta Board of Education public comment periods on the basis of viewpoint; and

   d. Prohibiting speakers from speaking or petitioning at Augusta Board of Education public comment periods because their speech or petitioning refers to members of the board or to school employees, when that speech or petitioning is non-disruptive and relevant to school and education matters;

2. Grant declaratory relief consistent with the injunction, to the effect that:

    a.  Provisions E, H, and J of Augusta Board of Education's Policy BEDH violate the First Amendment and Fourteenth Amendments' rights of speech and petition; and

    b.  Defendants violated Plaintiff's First Amendment rights by enforcing Policy BEDH against Plaintiff; and

    c.  Defendants violate First Amendment rights if they discriminate under any policy or practice against speech or petitioning at public comment periods on the basis of viewpoint; and

    d.  Defendants violate First Amendment rights if they prohibit public commenters under any policy or practices from referring to board members or school employees when commenting non-disruptively on school and education matters;

3. An award of nominal damages in the amount of $17.91;

4. Cost of suit, including attorney fees and expenses pursuant to 42 U.S.C. § 1988; and

5. Any other relief as the Court deems just and appropriate.

Dated: January 27, 2026       Respectfully submitted,

                      By:   */s/ David Gordon*

Nathan Ristuccia*[1]        David Gordon
Virginia Bar No. 98372      Maine Bar No. 011432
Brett Nolan*             Stephen C. Smith
DC Bar No. 90014964       Maine Bar No. 8270
INSTITUTE FOR FREE SPEECH   STEVE SMITH TRIAL LAWYERS
1150 Connecticut Avenue, N.W.  191 Water Street

---

[1] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

27

Suite 801                          Augusta, ME 04330
Washington, DC 20036               Tel: (207) 622-3711
(202) 301-3300                     Fax: (207) 707-1036
nristuccia@ifs.org                 david@americantrialgroup.com
bnolan@ifs.org                     steve@americantrialgroup.com

\* Application pro hac vice to be filed

*Counsel for Plaintiff*