**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| | : | |
| NICHOLAS BLANCHARD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. |
| v. | : | |
| | : | |
| AUGUSTA BOARD OF EDUCATION; | : | Oral Argument Requested |
| MARTHA WITHAM, Chair, Augusta | : | |
| Board of Education, in her official and | : | |
| individual capacities; and AUGUSTA | : | |
| SCHOOL DEPARTMENT; | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

ARGUMENT ................................................................................................................. 6

    I.    PLAINTIFF WILL SUCCEED ON THE MERITS ......................................................... 7

        A.  Augusta Board of Education's policy and practices are unconstitutional in every government forum. ......................................... 7

        B.  Augusta Board of Education's policy is unduly vague, granting unbridled enforcement discretion to the Chair....................................... 13

        C.  Augusta Board of Education's policy sweeps overbroadly, chilling vast amounts of protected speech............................................................ 16

    II.   DEFENDANTS IRREPARABLY DAMAGE PLAINTIFF BY PREVENTING HIM FROM COMMENTING ON EQUAL GROUNDS WITH OTHER SPEAKERS .................. 17

    III.  PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC INTEREST, SO THE BALANCE OF EQUITIES FAVORS PLAINTIFF........................ 18

    IV.  THIS COURT SHOULD WAIVE THE RULE 65(C) SECURITY REQUIREMENT ........ 18

CONCLUSION ............................................................................................................. 19

CERTIFICATE OF SERVICE ......................................................................................... 20

ii

**TABLE OF AUTHORITIES**

**CASES**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) .................................................................................... 9

*Am. Freedom Def. Initiative v. King Cnty.,*
904 F.3d 1126 (9th Cir. 2018) ................................................................... 10

*Am. Freedom Def. Initiative v. Suburban Mobility Auth.,*
978 F.3d 481 (6th Cir. 2020) ..................................................................... 14

*Bl(a)ck Tea Soc'y v. City of Bos.,*
378 F.3d 8 (1st Cir. 2004) .......................................................................... 17

*Bourne v. Arruda,*
No. 10-cv-393-LM, 2011 U.S. Dist. LEXIS 62332
(D.N.H. June 10, 2011) .............................................................................. 13

*Carson v. Makin,*
596 U.S. 767 (2022) .................................................................................... 8

*Cohen v. California,*
403 U.S. 15 (1971) ...................................................................................... 10

*Comcast of Me./New Hampshire, Inc. v. Mills,*
435 F. Supp. 3d 228 (D. Me. 2019) ........................................................... 6

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985) ............................................................................ 7, 11

*Counterman v. Colorado,*
600 U.S. 66 (2023) ...................................................................................... 10

*Curnin v. Town of Egremont,*
510 F.3d 24 (1st Cir. 2007) ........................................................................ 7

*Cutting v. City of Portland,*
No. 2:13-cv-359-GZS, 2014 U.S. Dist. LEXIS 17481
(D. Me. Feb. 12, 2014) ............................................................................... 17

*Del Gallo v. Parent,*
557 F.3d 58 (1st Cir. 2009) ........................................................................ 8

*Doe v. Mills,*
16 F.4th 20 (1st Cir. 2021) ............................................. 17

*Gooding v. Wilson,*
405 U.S. 518 (1972) ..................................................... 16

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ................................................. 13, 15

*Hill v. Colorado,*
530 U.S. 703 (2000) ..................................................... 13

*Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y.*
*Dep't of Parks & Rec.,*
311 F.3d 534 (2d Cir. 2002) ............................................. 7

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines,*
925 F.2d 6 (1st Cir. 1991) ............................................. 18

*Ison v. Madison Local Sch. Dist. Bd. of Educ.,*
3 F.4th 887 (6th Cir. 2021) ........................................... 10

*Mahanoy Area Sch. Dist. v. B.L.,*
594 U.S. 180 (2021) ..................................................... 1

*Marshall v. Amuso,*
571 F. Supp. 3d 412 (E.D. Pa. 2021) ................................... 10

*McBreairty v. Sch. Bd. of RSU22,*
616 F. Supp. 3d 79 (D. Me. 2022) ...................................... 7

*McCoy v. Town of Pittsfield,*
59 F.4th 497 (1st Cir. 2023) ........................................... 8

*McGuire v. Reilly,*
386 F.3d 45 (1st Cir. 2004) ............................................. 8

*Minn. Voters All. v. Mansky,*
585 U.S. 1 (2018) .................................................. 14, 16

*Moms for Liberty v. Brevard Pub. Sch.,*
118 F.4th 1324 (11th Cir. 2024) ..................... 9, 10, 11, 12, 14

*NAACP v. Alabama,*
377 U.S. 288 (1964) ....................................................................... 16

*Norris v. Cape Elizabeth Sch. Dist.,*
969 F.3d 12 (1st Cir. 2020) ............................................................... 6

*People for the Ethical Treatment of Animals v. Tabak,*
109 F.4th 627 (D.C. Cir. 2024) ................................................... 11, 14

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983) ............................................................................ 7

*Police Dep't of Chicago v. Mosley,*
408 U.S. 92 (1972) ............................................................................ 7

*Pollak v. Wilson,*
No. 22-CV-49-ABJ, 2024 U.S. Dist. LEXIS 229713
(D. Wyo. Oct. 25, 2024) .................................................................. 11

*Ridley v. Mass. Bay Transp. Auth.,*
390 F.3d 65 (1st Cir. 2004) ............................................................... 7

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
515 U.S. 819 (1995) .......................................................................... 7

*Scaer v. City of Nashua,*
No. 25-1356, 2025 LX 506595 (1st Cir. Dec. 22, 2025) ..................... 8

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
699 F.3d 1 (1st Cir. 2012) ............................................................ 6, 17

*Texas v. Johnson,*
491 U.S. 397 (1989) ...................................................................... 1, 9

*Virginia v. Hicks,*
539 U.S. 113 (2003) ........................................................................ 16

*Waugh v. Genesis Healthcare LLC,*
222 A.3d 1063 (Me. 2019) ................................................................. 9

*Westernbank P.R. v. Kachkar,*
No. 07-1606 (ADC/BJM), 2008 U.S. Dist. LEXIS 109809
(D.P.R. July 23, 2008) ..................................................................... 18

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
249 F. Supp. 2d 98 (D. Mass. 2003) .......................................................................... 18

**STATUTES**

20-A M.R.S. § 1001(20) ...................................................................................... 2, 7

## INTRODUCTION

The Augusta Board of Education prohibits people from saying anything "negative" about individuals or the board when giving public comments at its monthly meetings. The board forbids comments that it finds "abusive," "vulgar," "defamatory," "disparaging," "offensive," "gossip[y]," or "rude." And it will remove people by force if they break those rules.

Over the last year, the Board of Education has repeatedly prevented Plaintiff Nicholas Blanchard from expressing his views on school and education matters. The board has stopped Blanchard, for example, from calling his political opponents "beta males" and "cult" members, from petitioning for firing of a high-level administrator, from criticizing board members for chronic absenteeism and unlawful votes, and once apparently just from using a board member's first name. And because Defendants themselves recorded these interactions, the material facts are undisputed.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Defendants cannot open up a forum for the public to comment upon school and education matters and then censor speakers who use language and express viewpoints that offend them. Defendants' policy is vague, overbroad, undefined, and inherently subjective. Indeed, the Board of Education's own members have openly disagreed about what speech is permitted.

"America's public schools are the nurseries of democracy." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021). As school officials, Defendants have a duty to educate children about America's civic values, about its Constitution, and about the

1

fundamental rights it guarantees. Defendants themselves, however, require remedial instruction on these points.

The Court should secure Plaintiff's First Amendment rights by preliminarily enjoining the Augusta Board of Educations from enforcing any policy or practice that discriminates against public comment at school board meetings on the basis of viewpoint or prohibits speakers from referring to board members or school employees when commenting on school or education matters.

STATEMENT OF FACTS

The Augusta Board of Education—the governing body of the Augusta School Department—has a policy (BEDH) on "Public Participation at Board Meetings." Ex. A; *see also* Blanchard Decl., ¶¶ 11-16. This policy permits "members of the public to express opinions and concerns related to the matters concerning education and the Augusta Board of Education schools" during a designated public comment period. Ex. A at 1; *see also* 20-A M.R.S. § 1001(20) (requiring Maine school board meetings to include public comment "on school and education matters"). Policy BEDH forbids public commenters from engaging in certain forms of speech. "Speakers are not permitted to share gossip, make defamatory comments, or use abusive or vulgar language." Ex. A at 2. Likewise, "personal matters," "complaints concerning specific employees or students," and "allegations . . . concerning any person employed by the school system or against particular students" are not allowed. *Id.* at 1-2; *cf.* Ex. B. The Board of Education's Chair is "responsible for maintaining proper order" and authorized "to stop any presentation that violates these guidelines [in Policy BEDH] or the privacy rights of others." Ex. A at 1-2.

2

Over the last year, members of the public (including Plaintiff Nicholas Blanchard) and members of the board alike have expressed confusion over the meaning of Policy BEDH. Blanchard Decl., ¶¶ 19-24, 32, 39, 48; *see also* Ex. C at 3-4; Ex. D at 2-3, 6. As a result, Chair Martha Witham has repeatedly explained how she interprets key terms. During the May 14, 2025, meeting, for instance, Witham clarified that the policy "is only that we won't speak negatively"—so positive or "non-negatory" remarks about individuals are allowed. *Id.*, ¶¶ 21-24. Witham also indicated that "negative" is a catchall term for provisions within Policy BEDH banning, for instance, "abusive" and "defamatory" language. *Id.*, ¶¶ 23-24. Similarly, during the July 9, 2025, comments period, Witham defined "a defamatory statement" as a statement "that can injure one's reputation" and "abusive" language as "language that is harmful or offensive to a person." *Id.*, ¶¶ 19-20.

Nicholas Blanchard—an Augusta resident with a school-aged child—gave public comments at every business meeting of the Board of Education between January 8, 2025, and November 12, 2025. *See id.*, ¶¶ 1-2, 18, 25, 65. On seven occasions, Witham interrupted Blanchard's comments and prevented him from speaking because his comments purportedly violated the board's rules. *Id.*, ¶¶ 27, 32, 36-37, 43, 48, 53, 57. Sometimes, Witham permitted Blanchard to finish his comments as long as he changed the topic or avoided language violating Policy BEDH. *Id.*, ¶¶ 27, 53, 58, 73-74. But during some meetings, Witham prevented Blanchard from continuing to speak at all, by calling for a recess to cut Blanchard's comments short, by declaring Blanchard's time forfeit, or by threatening to have him forcibly removed by police if he continued to speak. *Id.*, ¶¶ 33, 38-40, 43, 48-49.

Witham has prohibited Blanchard from criticizing the school board itself. At the January 8, 2025, meeting, for instance, Blanchard referred to male school members who disagreed with Blanchard about the gender identity matters under discussion as "soft beta males who won't stand up for what is right." *Id.*, ¶¶ 25-26. Witham disallowed this as a "disparaging remark[]." *Id.*, ¶¶ 27-28. Likewise, at the April 9, 2025, meeting, Witham would not permit Blanchard's "negative comments" when he criticized a board member who voted against Title IX compliance. *Id.*, ¶¶ 36, 41. On June 11, Witham ordered Blanchard to "refrain from disparaging remarks" after he grumbled that the board had placed ideology over academic excellence and stated that "we are done watching the alphabet cult shove its propaganda down our throat and in our schools." *Id.*, ¶¶ 47-50. On July 9, Witham barred Blanchard's "derogatory comments to individuals" after he condemned a board member's chronic absenteeism. *Id.*, ¶¶ 51-54. And on August 13, Blanchard was interrupted for "rude comments" after he compared the board to communists and referred to one board member by her first name. *Id.*, ¶¶ 57-59.

Witham has also prevented Blanchard from criticizing a school employee who also served independently as president of the Maine Principals' Association (MPA). During his February 12, 2025, comments, Blanchard mentioned the MPA's president's presence in the room (without using her name or mentioning that she is also a school employee) and warned that the MPA's actions on transgender athletics could cause Maine schools to lose federal funding. *Id.*, ¶¶ 29-34. Witham stopped this "disparaging remark[]," characterizing it as "inappropriate" and "not allowed," and stated that "we aren't accepting any comments about our personnel." *Id.*, ¶¶ 32, 34. Similarly, at the April 6 meeting, Blanchard discussed how he was gathering

signatures on a petition asking the Board of Education to vote to fire the MPA's president from her position at Augusta schools. *Id.*, ¶¶ 35-37. Witham cut Blanchard off for and forced him to "step from the podium"—although three minutes of his speaking time remained—because Witham believed Blanchard was "about making defamatory remarks about school personnel" and such "comments will not be tolerated at the meeting directed to us or anybody else in this room." *Id.*, ¶¶ 37-41.

Nicholas Blanchard has objected to how the board has treated him and other commenters who were censored at meetings. *See id.*, ¶¶ 42-43, 45, 60-63. He has warned that the board's policy and practices violate the First Amendment and asked them to clarify how his comments qualified as disparaging, defamatory, rude, and so forth. *Id.*, ¶¶ 32, 39, 42, 48, 52, 60-63, 69; *see also* Ex. C; Ex. D. He has pointed out that the board enforces its policy haphazardly and selectively, so that, for instance, one of Blanchard's political opponents has been permitted to criticize Blanchard personally during her comments, without interruption. Blanchard Decl., ¶¶ 45-46, 56-57, 72.

Blanchard intends to express his views on school and education matters at future Board of Education meetings. *Id.*, ¶¶ 66-69. If permitted, he would express himself in the same way that he did previously, using words and phrases that the board may find negative, defamatory, derogatory, disparaging, abusive, gossipy, vulgar, or rude. *Id.*, ¶¶ 67, 69. Although he does not intend to bring formal complaints under Policy KE about school employees, Blanchard does intend to criticize employees and board members when that criticism is relevant to the school matter under discussion or to a petition being presented. *Id.*, ¶¶ 68-69; *cf.* Ex B

(noting that "complaints that concern Board actions or operations" are "exceptions" to Policy KE and "should be addressed to the Board Chair").

Plaintiff finds it frustrating and degrading that Defendants prohibit him from expressing his viewpoint about school and education matter, using the language that he would choose, even though other speakers promote their viewpoints and opinions using negative language. *Id.*, ¶ 72. However, plaintiff reasonably expects that without judicial relief, Witham and the Board of Education will not permit him to express his views using the language that he wishes to use, because they consider his comments to violate Policy BEDH. *Id.*, ¶ 70. In order to speak again without interruption or removal, Blanchard believes that he would need to self-censor and avoid anything that the board might characterize as negative. *Id.*, ¶¶ 71, 73-74.

### ARGUMENT

When assessing a motion for a preliminary injunction, a court must consider: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm; (3) whether the balance of equities favors the injunction; and (4) whether the injunction is in the public interest. *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). Once a plaintiff "show[s] that the state law infringes on [his] First Amendment rights," the burden shifts to the government to "justify its restriction on speech under the appropriate constitutional standard." *Comcast of Me./New Hampshire, Inc. v. Mills*, 435 F. Supp. 3d 228, 233 (D. Me. 2019) (citations and internal quotation marks omitted).

I.    PLAINTIFF WILL SUCCEED ON THE MERITS

   A. Augusta Board of Education's policy and practices are unconstitutional in
      every government forum.

      1. *The First Amendment forbids Defendants from restricting public
         comments in an unreasonable or viewpoint-discriminatory manner.*

Under the First Amendment, the "government may not grant the use of a forum
to people whose views it finds acceptable, but deny use to those wishing to express
less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S.
92, 96 (1972). A limited public forum exists "where the government opens a non-
public forum[1] but limits the expressive activity to certain kinds of speakers or to the
discussion of certain subjects." *Hotel Emples. & Rest. Emples. Union, Local 100 v.
City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002) (cleaned up).
"Once it has opened a limited forum . . . the State must respect the lawful
boundaries it has itself set." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515
U.S. 819, 829 (1995) (internal quotation marks and citations omitted). Speech
restrictions in such a forum "can be based on subject matter and speaker identity so
long as the distinctions drawn are reasonable in light of the purpose served by the
forum and are viewpoint neutral.'" *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp.
3d 79, 93 (D. Me. 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788, 806 (1985)).

A public comment period at a school board meeting constitutes a limited public
forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7
(1983); *Hotel Emples.*, 311 F.3d at 545; *McBreairty*, 616 F. Supp. 3d at 92 & n.13

---

[1] The First Circuit treats "limited public forum" and "nonpublic forum" as
synonyms. *See, e.g.*, *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 n.4 (1st Cir.
2004) (citing cases); *Curnin v. Town of Egremont*, 510 F.3d 24, 28 (1st Cir. 2007).

(collecting cases). At all its business meetings, the Augusta Board of Education opens such a forum to provide "a fair and adequate opportunity" for members of the public "to express opinions and concerns related to the matters concerning education and the Augusta Board of Education schools." Ex. A at 1; *see also* 20-A M.R.S. § 1001(20). Commenters may speak on "any subject directly related to the operations of the schools," with the exception of topics prohibited by Policy BEDH. *See* Ex. A at 1-2. And any regulations restricting public comment during this time must be "both viewpoint neutral and reasonable to be constitutional." *Del Gallo v. Parent*, 557 F.3d 58, 72 (1st Cir. 2009).[2]

### 2. *Defendants discriminate against disfavored viewpoints.*

Defendants' policy of forbidding commenters from "shar[ing] gossip, mak[ing] defamatory comments, or us[ing] abusive or vulgar language," or stating a "complaint or allegation . . . concerning any person employed by the school system," Ex. A at 2, discriminates based on viewpoint because it only restricts speech that Defendants consider negative or offensive.

A restriction on speech is "viewpoint-based if it targets not subject matter, but particular views taken by speakers on a subject." *McCoy v. Town of Pittsfield*, 59 F.4th 497, 505 (1st Cir. 2023) (internal quotation marks omitted). "The essence of a

---

[2] Although Policy BEDH states that "Board meetings are not public forums," Ex. at A, the "mere copying of [a] disclaimer" stating that an outlet for speech is "not intended to serve as a forum for free expression by the public" is insufficient to keep that outlet from being a limited public forum. *Scaer v. City of Nashua*, No. 25-1356, 2025 LX 506595, at *18-19 (1st Cir. Dec. 22, 2025). First Amendment analysis "turn[s] on the substance . . . not on the presence or absence of magic words." *Carson v. Makin*, 596 U.S. 767, 785 (2022). Here, the Board of Education opens its meetings for public comment about the school district and other education matters, creating a limited public forum

viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

Restricting speech because it is critical, offensive, irreverent, unpleasant, or otherwise flouts "society's sense of decency or propriety" constitutes viewpoint discrimination. *Iancu v. Brunetti*, 588 U.S. 388, 394-95 (2019). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414 . "It is not the role of the State or its officials to prescribe what shall be offensive." *303 Creative LLC v. Elenis*, 600 U.S. 570, 601-602 (2023) (cleaned up). "Restrictions that bar offensive or otherwise unwelcome speech are impermissible, regardless of the forum in which the government seeks to impose them." *Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 1334 (11th Cir. 2024).

Policy BEDH prohibits comments that the Board of Education's chair deems to be "abusive," "vulgar," "gossip," "defamatory," or a "complaint or allegation" about school employees. Ex. A at 2. Moreover, Witham has stated that she interprets the policy to bar "language that is harmful or offensive to a person," remarks "that can injure one's reputation," and "speak[ing] negatively" about anyone. Blanchard Decl., ¶¶ 1924. Defendants have stopped Plaintiff from making comments that were allegedly "disparaging," "derogatory," "rude," and "negative" about school personnel. *Id.*, ¶¶ 27, 32, 36, 48, 53, 57. Both facially and as-applied, then, the Board of Education's policy and practice ban a wide variety of protected speech based on the viewpoint conveyed.[3]

_____

[3] While some speech—like defamation and obscenity—might not be protected, the

The Supreme Court, for instance, has identified bans on "derogatory," "disparaging," "vulgar," and "abusive" speech as impermissible viewpoint discrimination because they target offensive speech. *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 86-87 (2023); *Brunetti*, 588 U.S. at 392, 397; *Matal v. Tam*, 582 U.S. 218, 223, 228–29 (2017) (plurality opinion); *id.* at 249 (Kennedy, J., concurring). The government cannot "forbid certain words without also running a substantial risk of suppressing ideas in the process" and "banning the expression of unpopular views." *Cohen v. California*, 403 U.S. 15, 26 (1971). As a result, "[t]he First Amendment's viewpoint neutrality principle . . . protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Tam*, 582 U.S. at 249 (Kennedy, J., concurring). Laws "mandating positivity" can "silence dissent and distort the marketplace of ideas," violating the First Amendment. *Id.*; *see also id.* at 243 (plurality opinion) ("Giving offense is a viewpoint.").

As a result, Defendants' ban on complaints and on abusive, vulgar, and gossipy speech is unconstitutional. Courts have repeatedly invalidated similar policies banning offensive speech at school board meetings and other limited public fora. *See, e.g.*, *Moms for Liberty*, 118 F.4th at 1334-35 (school board policy forbidding "abusive" speech facially unconstitutional); *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893, 895 (6th Cir. 2021) (striking down ban on "abusive" or

---

Board does not limit its policy to those narrow and well-defined categories. True defamation, for example, is not simply any remark that might injure one's reputation, which is how Witham interprets the word in Policy BEDH. *Compare* Blanchard Decl., ¶¶ 19-20, *with Waugh v. Genesis Healthcare LLC*, 222 A.3d 1063, 1066 (Me. 2019). And true defamation requires proving elements that no person could adjudicate on the spot during a board meeting.

"antagonistic" speech at a school board meeting); *Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1131-33 (9th Cir. 2018) (striking down ban on "disparagement" in nonpublic forum); *Marshall v. Amuso*, 571 F. Supp. 3d 412, 422 (E.D. Pa. 2021) (invalidating a policy allowing complimentary comments about individuals but not critical ones).

Additionally, "[t]he facial viewpoint bias in the [policy] results in viewpoint-discriminatory application." *Brunetti*, 588 U.S. at 395. Defendants do not prohibit all public comments on topics such as transgender policies, the board's own actions, or the performance of school employees. *See* Ex. A at 2; Blanchard Decl., ¶¶ 22-24, 45-46, 56, 72. Only "negative" comments are banned. Indeed, Defendants have allowed commenters praising the board or school employees or promoting inclusive policies on gender identity to make disparaging remarks about individuals. *Id.*, ¶¶ 36, 45-46, 56. Defendants single out particular positions and forms of argument about school and education matters as unacceptable. This is viewpoint discrimination of the most obvious sort.

> 3. *Defendants unreasonably undermine the purpose of the public comment period by preventing the public from effectively expressing their opinions and concerns about school and education matters.*

The Board of Education's policy and practices also unreasonably prevent Blanchard and those who agree with him from expressing their position in the manner that they choose. This policy undermines "the purpose served by the forum." *Cornelius*, 473 U.S. at 806. In a forum designed for "constructive dialogue through the public's comments," reasonableness is "necessarily a more demanding test than in forums that have a primary purpose that is less compatible with expressive activity." *People for the Ethical Treatment of Animals v. Tabak*, 109

11

F.4th 627, 636 (D.C. Cir. 2024) (internal quotation marks omitted). A school board policy is unreasonable if it "actively obstructs a core purpose" of the meeting by making it "impossible, for speakers to adequately air their concerns." *Moms for Liberty*, 118 F.4th at 1337-38; *see also Pollak v. Wilson*, No. 22-CV-49-ABJ, 2024 U.S. Dist. LEXIS 229713, at *31 (D. Wyo. Oct. 25, 2024) (board policy that "interferes with the public's ability to communicate with their government" unreasonable).

The Board of Education creates a forum for public comment at all school board meetings with the purpose of hearing the public's "opinions and concerns related to the matters concerning education and the Augusta Board of Education schools." Ex. A at 2. The goal is "public discussion" on board matters, allowing "a fair and adequate opportunity for the public to be heard." *Id.*

Blanchard has commented on a wide range of matters related to education and Augusta schools, including the school system's transgender policy, federal education funding, inappropriate behavior by school employees, ideological indoctrination in classrooms, and the board's own actions. *See* Blanchard Decl., ¶¶ 25, 30, 35-37, 47, 53, 64. All these comments were germane both to education policy broadly and to topics discussed at the board meetings. Nevertheless, Defendants' policy and practices stopped Blanchard from presenting his position fully or arguing using language he believed would most effectively convey his points.

It is unreasonable for Defendants to prevent commenters from referring to board members or school employees when their actions or personal information are relevant to a school district matter under discussion. The Board of Education bans "complaints or allegations" or discussion of "personal matters" concerning school

employees or staff, "gossip," and speech violating "the privacy rights of others." Ex. A at 2. The board's rules "actively obstruct[] a core purpose of the Board's meetings—educating the Board and the community about community members' concerns." *Moms for Liberty*, 118 F.4th at 1337. "If a parent has a grievance about, say, a math teacher's teaching style, it would be challenging to adequately explain the problem without referring to that math teacher. Or principal. Or coach. And so on. . . . Such communications are the heart of a school board's business, and the ill-defined and inconsistently enforced policy barring personally directed speech fundamentally impedes it without any coherent justification." *Id.*

"The right to criticize public officials is protected by the First Amendment." *Bourne v. Arruda*, No. 10-cv-393-LM, 2011 U.S. Dist. LEXIS 62332, at *40 (D.N.H. June 10, 2011) (cleaned up). Yet Defendants interpret their rules to even prevent speakers from criticizing board members themselves for actions that members took in public in their capacities as elected officials. *See* Blanchard Decl., ¶¶ 27-28, 36, 41, 47-54, 57-59. These rules thus insulate the board from being criticized by the very constituents who elected the board to represent their interests.

The Board of Education's policy hinders speech on issues squarely within the forum's purpose, making it unreasonable under the First Amendment.

> B. Augusta Board of Education's policy is unduly vague, granting unbridled enforcement discretion to the Chair.

Defendants' policy is also inherently subjective, lacks sufficient implementation guidance, and grants excessive enforcement discretion to school officials. The policy is both vague and incapable of reasoned application—two interrelated reasons that invalidate the policy.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law can be "impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colora*do, 530 U.S. 703, 732 (2000) (citation omitted).

Likewise, a policy governing speech in a government forum must be sufficiently clear and objective to be "capable of reasoned application." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 23 (2018). The government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 16. "An indeterminate prohibition carries with it the opportunity for abuse, especially where it has received a virtually open-ended interpretation," so official discretion "must be guided by objective, workable standards," lest an official's "own politics may shape his views on what counts." *Id.* at 21-22. Thus, a policy is unconstitutional "if it fails to define key terms, lacks any official guidance, and vests too much discretion in those charged with its application." *Moms for Liberty*, 118 F.4th at 1332; *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 494, 497 (6th Cir. 2020) ("broadly phrased policy" using term with "opaque definition" unreasonable).[4]

---

[4] Vagueness and unreasonableness due to excessive enforcement discretion overlap. In *Mansky*, the Supreme Court applied vagueness principles to determine whether a speech regulation at a nonpublic forum was "unreasonable." 585 U.S. at 16-22. The Sixth, Eleventh, and D.C. Circuits have followed *Mansky*'s lead. *See Brevard*, 118 F.4th at 1332-33; *Suburban Mobility*, 978 F.3d at 494-95; *Tabak*, 109 F.4th at 636. To the extent this distinction matters, Plaintiff's vagueness challenge should also be construed as challenging the policy's reasonableness.

Defendants have never defined key policy terms in writing "gossip," "abusive or vulgar language," "complaints or allegations," "personal matters," or speech violating "privacy rights." Ex. A. at 2. Moreover, the enforcement history and chair's comments interpreting these terms during meetings makes the meaning of these words less clear, rather than more. Seemingly, Defendants consider the restrictions in Policy BEDH to be roughly synonymous with other words such as "negative," "derogatory," "disparaging," "rude," "harmful or offensive to a person," and "injur[ious to] one's reputation." Blanchard Decl., ¶¶ 19, 22-23, 27, 32, 36, 48, 53. But the policy itself provides no guidance.

Almost any criticism can be said to be negative, disparaging, or injurious to one's reputation. The policy might prohibit comments disagreeing with a school rule, complaining about wasteful spending, or objecting to a decision of the board itself— because all those involve negative remarks about people. Perhaps the school board intended the terms in Policy BEDH to have narrower meanings, but if so, neither the policy nor the Board's enforcement makes these narrower meanings clear.

Vacuous terms such as "abusive" or "personal," *see* Ex. A at 2, have "uncertain meanings [that] inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked" and thus chill speech. *Grayned*, 408 U.S. at 109 (cleaned up). Indeed, although Blanchard has repeatedly asked Witham to explain how his comments violated the rules, she has consistently declined to clarify. Blanchard Decl., ¶¶ 32, 39, 42, 48, 52. As a result, Blanchard has repeatedly found himself interrupted and silenced again—on the same or similar grounds—when he tried to comment at a later Board of Education meeting. *Id.*, ¶¶ 32, 48, 51, 53, 57. Even the board itself seems confused about the policy's scope, for

15

board members have publicly disagreed with Witham about what Policy BEDH covers. *Id.*, ¶¶ 21-24.

The Board of Education has given commenters no notice about what its policy forbids and implicitly authorizes officials to enforce this policy discriminatorily.

C. Augusta Board of Education's policy sweeps overbroadly, chilling vast amounts of protected speech.

Defendants' policy is also overbroad. Speech regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal quotation marks and citations omitted) (emphasis original). Prohibiting "words offensive to some who hear them . . . sweeps too broadly" to be constitutional and "is easily susceptible to improper application." *Gooding v. Wilson*, 405 U.S. 518, 527-28 (1972) (cleaned up). "There are a great many immoral and scandalous ideas in the world," so a law barring them all "is substantially overbroad." *Brunetti*, 588 U.S. at 399.

Policy BEDH categorically bans forms of comments—those that "share gossip, make defamatory comments, or use abusive or vulgar language," that constitute a "complaint or allegation . . . concerning any person employed by the school system," that are "personal matters," or that infringe on "the privacy rights of others." Ex. A at 2. Because many or all of these are boundless categories lacking "objective, workable standards," a school official's "own politics may shape his views on what

16

counts." *Mansky*, 585 U.S. at 21-22. Indeed, Defendants seem to interpret their policy to permit them to censor any speech they dislike or find negative—an interpretation they applied to Blanchard's comments. *See* Blanchard Decl., ¶¶ 19-24, 36.

Policy BEDH sweeps in vast amounts of protected expression. By implementing and enforcing this overbroad policy, Defendants deprive Blanchard of his constitutional freedoms.

II.   DEFENDANTS IRREPARABLY DAMAGE PLAINTIFF BY PREVENTING HIM FROM COMMENTING ON EQUAL GROUNDS WITH OTHER SPEAKERS

"A burden on protected speech always causes some degree of irreparable harm." *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 15 (1st Cir. 2004); *see also Sindicato*, 699 F.3d at 10-11. Injunctive relief is required to address the irreparable injury that Blanchard presently suffers. Blanchard wants to continue speaking at board meetings about the school's transgender policies, the board's disregard of the First Amendment, the school system's budget, and other matters related to education. Ex. A; Blanchard Decl., ¶ 66. He also wants to criticize school employees and individual board members who he believes are promoting unlawful policies and harming the district's children. *Id.*, ¶¶ 66, 68. And he wants to express himself in the same way he has previously, using similarly harsh language the board may find negative, offensive, or critical. *Id.*, ¶¶ 67. 69-70. Unless this Court grants relief, Defendants will continue to prevent Blanchard from expressing his viewpoints fully at board meetings.

III.    PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC INTEREST, SO THE BALANCE OF EQUITIES FAVORS PLAINTIFF

"When the Government is the opposing party," courts "merge" "balancing of the equities and analysis of the public interest together." *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (cleaned up). "Protecting rights to free speech is ipso facto in the interest of the general public," for "absent an injunction the free speech of others may be chilled." *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 U.S. Dist. LEXIS 17481, at *35 (D. Me. Feb. 12, 2014) (citation omitted).

Denying injunctive relief would leave Defendants free to violate the rights of Blanchard and the public through their unconstitutional policy and practices. In contrast, enjoining this policy would not stop the Board of Education from running public schools or performing any legitimate educational function. Defendants can continue to enforce reasonable and viewpoint-neutral restrictions at meetings to ensure there is no disruption of school business. Defendants suffer no valid harm from a preliminary injunction.

IV.    THIS COURT SHOULD WAIVE THE RULE 65(C) SECURITY REQUIREMENT

District courts possess "substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (collecting cases). "The bond amount may be zero if there is no evidence the party will suffer damages" for "the burden is on the party seeking security to establish a rational basis for the amount." *Westernbank P.R. v. Kachkar*, No. 07-1606 (ADC/BJM), 2008 U.S. Dist. LEXIS 109809, at *47 (D.P.R. July 23, 2008) (cleaned up). Furthermore, "the First Circuit has recognized an exception to the security bond requirement in Fed. R. Civ. P. 65(c) in suits to enforce important federal rights or public interests." *Westfield High Sch. L.I.F.E. Club v. City of*

*Westfield*, 249 F. Supp. 2d 98, 129 (D. Mass. 2003) (citation and internal quotation marks omitted). Prohibiting Defendants from denying Blanchard equal opportunity to speak during the public comment period of board meetings will not cause any harm, monetary or non-monetary. *See id.* at 128-29 (dispensing with bond so as not to deter First Amendment rights). This Court should impose no bond requirement.

## CONCLUSION

This Court should grant Blanchard's motion for a preliminary injunction.

Dated: January 27, 2026

*/s/ David Gordon*
David Gordon
Maine Bar No. 011432
Stephen C. Smith
Maine Bar No. 8270
STEVE SMITH TRIAL LAWYERS
191 Water Street
Augusta, ME 04330
Tel: (207) 622-3711
Fax: (207) 707-1036
david@americantrialgroup.com
steve@americantrialgroup.com

Respectfully submitted,

Nathan J. Ristuccia*††
Virginia Bar No. 98372
Brett Nolan*
DC Bar No. 90014964
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste. 801
Washington, D.C. 20036
Tel: (202) 301-3300
Fax: (202) 301-3399
nristuccia@ifs.org
bnolan@ifs.org

*Application pro hac vice to be filed

*Counsel for Plaintiff*

---

†† Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

## CERTIFICATE OF SERVICE

I hereby certify that this motion will be served on Defendants with the complaint and signed summonses.

Executed under penalty of perjury.

Dated: January 27, 2026

_s/David Gordon_