UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

NICHOLAS BLANCHARD,                    )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        1:26-cv-00049-SDN
                                       )
AUGUSTA BOARD OF EDUCATION,            )
et al.                                 )
                                       )
            Defendants.                )

## ORDER

This matter is before the Court on Plaintiff Nicholas Blanchard's motion for a preliminary injunction. ECF No. 2. Mr. Blanchard seeks to enjoin the Augusta Board of Education; its chair, Martha Witham; and the Augusta School Department (collectively, the "Defendants") from enforcing various provisions of its Policy BEDH, which concerns public participation at school board meetings. For the following reasons, Mr. Blanchard's motion for a preliminary injunction is **GRANTED IN PART** and **DENIED IN PART.**

### BACKGROUND[1]

#### I.    The Parties

Mr. Blanchard resides in Augusta, Maine, with a school-aged child. ECF No. 6 ¶ 1. His child is eligible to attend public school in Augusta but is not currently enrolled. *Id*. ¶¶ 1, 2. The Augusta School Department ("School Department") operates Augusta's public schools. ECF No. 1 ¶ 4. The Augusta Board of Education (the "Board") governs the School

---

[1] The Court derives these facts from the complaint, ECF No. 1, preliminary injunction briefing, ECF Nos. 2, 18, 19, exhibits and affidavits submitted therewith, and parties' presentations at the April 17, 2026, hearing, ECF No. 21. In addition, the Court has reviewed and incorporates facts from the videos of the relevant school board meetings, which are referenced in the filings and available publicly online.

1

Department. *Id*. The Board comprises nine elected members and a student representative. *Id*. ¶ 2. Martha Witham is the Chair of the Board (the "Chair"). *Id*. ¶ 3.

## II.    The Board's Public Participation Policy ("Policy BEDH")

Under Maine law: "A school board shall provide the opportunity for the public to comment on school and education matters at a school board meeting. Nothing in this subsection restricts the school board from establishing reasonable standards for the public comment period, including time limits and conduct standards." 20-A M.R.S. § 1001(20). In accordance with this law, the Board holds monthly meetings which are open to the public. ECF No. 18 at 3. The Board also has enacted Board-related policies, such as Policy BEDH, which is titled "Public Participation at Board Meetings" ("Policy BEDH"). ECF No. 1 ¶ 9; *see* ECF No. 3. Policy BEDH states that "Board meetings are conducted for the purpose of carrying on the official business of the school system." ECF No. 3 at 1.

Pursuant to Policy BEDH, "the Board will provide appropriate opportunities at its meetings for members of the public to express opinions and concerns related to the matters concerning education" and Augusta public schools. *Id*. Policy BEDH invites members of the public to attend the Board's business meetings and participate by "speak[ing] on any subject directly related to the operations of the schools." *Id*. It also recognizes the Board's "intent [] to allow a fair and adequate opportunity for the public to be heard while ensuring that the time allowed for public discussions does not interfere with fulfillment of the scheduled agenda." *Id*. To further this aim, Policy BEDH provides general guidelines for public participation during Board meetings. *Id*. at 1–3. Mr. Blanchard objects specifically to three of those guidelines: Rules E, H, and J.

- Rule E states that "[s]peakers are not permitted to share gossip, make defamatory comments, or use abusive or vulgar language." ECF No. 3 at 2.

- Rule H prohibits "complaints or allegations . . . at Board meetings concerning any person employed by the school system or against particular students. Personal matters or complaints concerning student or staff issues will not be considered in a public meeting but will be referred through established policies and procedures." *Id*.

- Rule J authorizes the Chair "to stop any presentation that violates these guidelines or the privacy rights of others." *Id*.

### III.    Application of Policy BEDH at Board Meetings

For the purposes of this case, the dispute begins with the Board's January 2025 business meeting, when Mr. Blanchard provided his first public comment. ECF No. 1 ¶ 31. The January agenda included a discussion of amending the Board's sex discrimination and harassment policies and procedures. *Id*. ¶ 32. Before commencing the public comment period, the Chair addressed the audience and shared "even though we may not agree with what you have to say, we respect your right to say it." CTV7 Augusta, *Augusta School Board Meeting 01/08/2025*, at 42:57–43:06 (Vimeo, Jan. 8, 2025), https://vimeo.com/1038397320. She then highlighted several provisions of Policy BEDH to inform the audience of how public comment would proceed. *Id*. at 43:09–44:34.

The Chair noted that the Board meetings were not a public forum and stated she had the authority to limit the time allotted for comments—at the January meeting, the Board allowed two minutes per speaker—as well as stop any presentation that violated Policy BEDH guidelines or the privacy rights of others. She warned that the Board would not permit speakers to share gossip, make defamatory comments, or use abusive or vulgar

language; that speakers could not present complaints or allegations concerning any person employed by the school system or against particular students; that the board discouraged duplicative or repetitive comments; and that persons who disrupt the meeting might be asked to leave and law enforcement might be asked to assist as necessary to restore order. *Id*. at 43:27–44:34. She also instructed that, to provide public comment, speakers had to be citizens of Augusta or employees of the district and had to sign up in advance. *Id*. at 44:43–44:47.

Mr. Blanchard was the third speaker. During his public comment, he stated, "here in Maine, it seems we have too many soft beta males that won't stand up for what is right" and added "it seems that I am looking at a couple of [them] right here." *Id*. at 50:30–5:40. The Chair interjected, stating "I'm sorry, but . . . disparaging remarks are not allowed." *Id*. at 50:40–50:43. Mr. Blanchard responded "okay" and continued with the remainder of his public comment. *Id*. at 50:45–52:00.

At the Board's February 2025 monthly business meeting, the Chair again opened the public comment period by highlighting Policy BEDH's public participation provisions. CTV7 Augusta, *Augusta School Board Meeting 02/12/2025*, at 1:22:45–1:24:27 (Vimeo, Feb. 12, 2025), https://vimeo.com/1055408924. In this introduction, she instructed attendees the Board would not "permit any defamatory comments or abusive language towards school employees, Board members, or others who are present," nor allow "complaint or allegations . . . concerning any person employed by the school, including administration and board members." *Id*. at 1:23:22–1:23:32, 1:23:40–1:23:50. She concluded by stating that while the Board "welcomes public comment" it requires "that all present be treated with respect." *Id*. at 1:24:13–1:24:26.

4

When it came time for Mr. Blanchard to comment, he initially played a recording of President Donald Trump instead of speaking in his own voice. *Id*. at 1:37:40–1:39:50. Eventually, Mr. Blanchard began to speak himself. *Id*. at 1:39:59. Near the end of his allotted time, Mr. Blanchard said, "I think we should all acknowledge the president of the Maine Principal Association that's going to cause all of our federal funding to go right out the window," while gesturing toward the Maine Principal Association ("MPA") President, who was present in the meeting room. *Id*. at 1:41:06–1:41:10 (lightly edited for clarity). The Chair interrupted him, stating "excuse me, excuse me . . . excuse me, no disparaging remarks." *Id*. at 1:41:17–1:41:22. Mr. Blanchard asked, "how is that disparaging?" and then continued to express concerns about the potential loss of federal funding for Augusta public schools based on MPA's stance, specifically invoking the MPA President as the reason for the potential funding cuts. *Id*. at 1:41:22–1:41:59.

The Chair replied, "those remarks are inappropriate. I'm sorry." *Id*. at 1:42:01. Mr. Blanchard asked, "how are they? How is that inappropriate?" and added, "they're true." *Id*. at 1:42:03–1:42:06. The Chair asked whether Mr. Blanchard had comments to make that were "not about . . . personnel," and Mr. Blanchard again asked, "how is that inappropriate?" *Id*. at 1:42:06–1:42:15. This back and forth repeated itself. *Id*. at 1:42:16–1:42:28. Mr. Blanchard then continued to speak against the purported loss of federal funding. *Id*. at 1:42:28–1:43:07. A Board member moved to go into recess; the Board voted to approve the motion and went into a brief recess, effectively ending Mr. Blanchard's time at the podium. *Id*. at 1:43:08–1:49:33.

During the March 2025 meeting, Mr. Blanchard provided public comment without interruption. CTV7 Augusta, *Augusta School Board Meeting 03/12/2025*, at 1:19:17–1:22:22 (Vimeo, Mar. 12, 2025), https://vimeo.com/1064501748. He again discussed

what he viewed as a threat to federal funding based on the MPA's school sports gender identity policies, but did not mention the MPA President by name or position and referred only generally to the MPA. *Id.*

At the April 2025 meeting, the Chair started the meeting by discussing Policy BEDH and stated, "no comments on personnel are allowed in any way." CTV7 Augusta, *Augusta School Board Meeting 04/09/2025*, at 45:13 (Vimeo, Apr. 9, 2025), https://vimeo.com/1069039362 [hereinafter "April Meeting"]. During his allotted time to speak, Mr. Blanchard approached the podium wearing a t-shirt that displayed the words "YOUR FIRED" and a picture of Principal Kimberly Liscomb on the front. *Id.* at 46:18. He began by thanking six Board members for their prior vote related to Title IX policies and contrasted their votes with that of the one member who had voted the opposite way; he did not identify any Board member by name. *Id.* at 46:27–46:38. The Chair interrupted part of his commentary, stating "negative comments" were not permitted. *Id.* at 46:40.

The exchange intensified when Mr. Blanchard discussed a petition to fire "Miss Kim" (i.e., Principal Liscomb), prompting the Chair to issue multiple warnings regarding "defamatory remarks about school personnel." *Id.* at 46:50–47:55. Mr. Blanchard attempted to continue by referring to Principal Liscomb only by her professional title rather than her name. The Chair ruled it was "close enough" to a violation of Policy BEDH, however, and ordered Mr. Blanchard to leave the podium with approximately three minutes of his allotted speaking time remaining. As he left, Mr. Blanchard remarked, "wow, communist China right here." *Id.* at 48:00–48:16.

During the May 2025 meeting, Mr. Blanchard approached the podium and placed tape over his mouth that read "I can't speak." CTV7 Augusta, *Augusta School Board*

6

*Meeting 05/14/2025*, at 1:29:15–1:30:52 (Vimeo, May 14, 2025), https://vimeo.com/1074124806 [hereinafter "May Meeting"]. He then played a pre-recorded statement about the First Amendment delivered in a voice that resembled President Trump. *Id*. The Chair interrupted and instructed Mr. Blanchard that he must use his own voice, or he would be asked to leave, and noted that the speaker in the recording had not identified himself. *Id*. at 1:30:03–1:30:15. Mr. Blanchard continued playing the recording, and the Chair repeated the same instruction. *Id*. at 1:30:15–1:30:27. In response, Mr. Blanchard approached the Chair's desk and placed a flag of the People's Republic of China on it. *Id*. at 1:30:33. The Board subsequently voted to go into recess for ten minutes, which prevented Mr. Blanchard from finishing his comments. *Id*. at 1:30:40–1:30:52.

The May meeting also included an exchange involving another speaker, Jennifer Curran, who began her comments by discussing a podcast conversation that occurred following the April meeting regarding the events of the meeting and interviewing a speaker from the meeting, presumably Mr. Blanchard. *Id*. at 1:52:15. A Board Member interrupted and stated that "public comment is to express opinions and concerns related to the matters concerning education," and further told the Chair that she didn't think Ms. Curran's comments were related to education matters. *Id*. at 1:53:06–1:53:12. This led to an exchange between Board members about what constituted such related matters. *Id*. at 1:53:12–1:53:29. Once Ms. Curran resumed speaking, she was interrupted by an audience member. *Id*. at 1:53:32–1:53:40, 1:55:09. This exchange and Ms. Curran's further comments led the Board to debate during the meeting whether Policy BEDH should prohibit both positive and negative comments, and how to define the relevant BEDH policy terms. *Id*. at 2:05:00–2:10:15.

7

During the June 2025 meeting, Mr. Blanchard criticized what he viewed as the Board's selective enforcement of Policy BEDH and alleged the Board prioritized ideology over academic excellence. CTV7 Augusta, *Augusta School Board Meeting 06/11/2025*, at 2:43:44–2:4:52 (Vimeo, June 11, 2025), https://vimeo.com/1084472398.  He stated that parents were "done watching the alphabet cult shove their propaganda down our throat and in our schools," *id*. at 2:46:24–2:46:30, prompting the Chair to interrupt and ask speakers to refrain from "disparaging remarks," *id*. at 2:46:32. Mr. Blanchard requested a clarification of what constituted disparaging remarks, but the Chair declined to explain further; Mr. Blanchard's speaking time ran for about 15 seconds during this exchange. When his allotted time expired, Mr. Blanchard refused to leave the podium and began yelling, stating that the interruptions had consumed his speaking time. *Id*. at 2:46:41–2:47:33. As the situation continued to escalate, the Chair requested the assistance of law enforcement officers present at the meeting. *Id*. Before the officers took any action, Mr. Blanchard left the room on his own accord, while referring to the Board as "sheep" and "communists." *Id*. at 2:47:34–2:47:46.

During the July 2025 meeting, the Chair again commenced the public comment period by reviewing Policy BEDH and relevant statutory rules. CTV7 Augusta, *Augusta School Board Meeting 07/09/2025*, at 1:34:34 (Vimeo, July 9, 2025), https://vimeo.com/1092644647.  She relied on dictionary definitions of "defamatory" and "abusive" to provide guidance to speakers. *Id*. at 1:36:53—1:37:12. When it was Mr. Blanchard's turn to speak, the Chair addressed him directly, recited the relevant Policy BEDH guidelines and stated, in part, that "in following those guidelines, I ask you to confine your comments to education and the Augusta schools as required by both the legislative law and Policy BEDH." *Id*. at 1:38:21—1:39:23.

When his time began, Mr. Blanchard used most of it to express his view that the Board's public comment policy violated the First Amendment and compared the Board's actions to a "regime that suppresses opposition." *Id.* at 1:39:38–1:40:37. He then shifted to criticizing a specific Board member for absenteeism and asked how many meetings the member had attended since being elected. The Chair interjected and stated "derogatory comments to individuals" were not permitted under Policy BEDH. *Id.* at 1:42:26–1:42:47. Mr. Blanchard briefly protested that he was simply "congratulating" the member for attending. Mr. Blanchard left the podium when his time expired and referred to the Board's timekeeper as the Chair's "little puppet." *Id.* at 1:42:56

During the August 2025 meeting, Mr. Blanchard again spoke during the public comment period and asserted the Board was attempting to "silence Augusta residents" who held opinions different from those of the Board. CTV7 Augusta, *Augusta School Board Meeting 08/13/2025*, at 1:39:59 (Vimeo, Aug. 13, 2025), https://vimeo.com/1100157502. He pointed at a specific member, called her "Ms. Susan," and stated she was the reason he had placed a Chinese flag on the podium at a prior meeting. *Id.* at 1:42:03. The Chair interjected and stated that "rude comments" would not be tolerated. *Id.* at 1:42:11 In response, Mr. Blanchard shouted questions at the Chair, demanding she explain how his comment was rude. Mr. Blanchard's time was paused during this exchange. *Id.* at 1:42:18. Once the Chair restarted his time, Mr. Blanchard completed his remarks without further interruption, while he continued to allege the Board selectively enforced Policy BEDH. *Id.* at 1:42:36–1:44:05.

During the September 2025 meeting, Mr. Blanchard discussed a letter from the Foundation for Individual Rights and Expression that outlined the organization's perceived constitutional issues with Policy BEDH. ECF No. 1 ¶ 75. He spoke without

interruption at this meeting, as well as during the October and November 2025 meetings. *Id*. ¶ 78. The Board did not hold a monthly business meeting in December 2025. *Id*. ¶ 79.

## IV.    Procedural Posture

On January 7, 2026, Mr. Blanchard filed his complaint, ECF No. 1, in this Court, along with a motion for a preliminary injunction, ECF No. 2. Mr. Blanchard asserts four claims under 42 U.S.C. § 1983, alleging that Policy BEDH violates the First and Fourteenth Amendments by: (1) engaging in viewpoint discrimination, facially and as applied; (2) imposing unreasonable restrictions on speech, facially and as applied; (3) being unconstitutionally vague; and (4) being unconstitutionally overbroad. ECF No. 1 at 18–25. Specifically, Mr. Blanchard asks the Court to enjoin the Defendants from: (1) enforcing Policy BEDH provisions E, H, and J—or any other substantially similar subsequent revisions—against public commenters at Board meetings "who are expressing viewpoints on school and education matters"; (2) selectively enforcing any provision of Policy BEDH, or future revisions, based on viewpoint; (3) engaging in viewpoint discrimination against "speech or petitioning" during Board public comment sessions; and (4) prohibiting speakers from speaking or petitioning at Board public comment sessions because they "refer[] to members of the board or to school employees, when that speech or petitioning is non-disruptive and relevant to school and education matters."[2] *Id*. at 26.

---

[2] At the April 17, 2026, hearing, Mr. Blanchard clarified that he does not challenge the portion of Policy BEDH that precludes discussion of particular students. ECF No. 22. The Court therefore limits its analysis to Policy BEDH only as it applies to school employees. In addition, Defendants conceded during the hearing that Rule H of Policy BEDH does not apply to members of the Board. *Id.*

## DISCUSSION

### I.   Legal Standard

Injunctive relief is an "extraordinary and drastic remedy" that is never awarded as of right. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *see Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain such relief, the movant must establish four elements: (1) a likelihood of success on the merits; (2) a risk of irreparable harm; (3) the balance of equities favors relief; and (4) an injunction serves the public interest. *See Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 9 (1st Cir. 2012). In First Amendment cases, the likelihood of success on the merits is the linchpin of this analysis. *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam). Indeed, if the movant fails to make that showing, the remaining factors carry little weight. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)). Conversely, when the movant demonstrates a likelihood of success on a First Amendment claim, courts generally presume irreparable harm. *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 19 (1st Cir. 2025). Ultimately, the Court retains broad discretion in deciding whether to grant a preliminary injunction. *Doe ex rel. Doe v. Portland Pub. Schs.*, 701 F. Supp. 3d 18, 32 (D. Me. 2023).

### II.   Standing

Before addressing the merits, the Court must first determine whether Mr. Blanchard has Article III standing to seek injunctive relief. In a facial First Amendment challenge, a plaintiff establishes injury in fact by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the

statute, and there exists a credible threat of prosecution." *Ramírez v. Sánchez Ramos*, 438 F.3d 92, 98 (1st Cir. 2006) (quotation modified). Mr. Blanchard has met that standard. He asserts he wants to provide public comment at future Board meetings and intends to do so in the same manner as before, including using language the Board might deem "negative, defamatory, derogatory, disparaging, abusive, gossipy, vulgar, or rude." ECF No. 6 ¶ 67. In particular, he plans to criticize the Board and its individual members for their policies and practices, including alleged First Amendment violations and decisions concerning curriculum and budget decisions. *Id*. ¶ 66. He also anticipates urging the Board to terminate employees he believes have promoted unlawful policies, referring to Board members and school employees by name or position, and criticizing them when relevant to matters under discussion. *Id*. ¶¶ 66, 68.

At the same time, Mr. Blanchard asserts that he currently self-censors to avoid language that could trigger enforcement of Policy BEDH and result in interruption or removal. *Id*. ¶ 71. This allegation underscores a present and ongoing chill on his speech. His stated intent to engage in arguably protected speech that Policy BEDH appears to prohibit, coupled with his self-censorship, establishes a credible threat of enforcement. Accordingly, Mr. Blanchard has standing to challenge Rules E, J, and H of Policy BEDH. *See, e.g.*, *McBreairty v. Miller*, No. 1:23-cv-00143, 2024 WL 2187436, at *5 (D. Me. May 15, 2024). Having determined Mr. Blanchard has standing to seek the injunctive relief he requests, the Court proceeds to the merits and evaluates the four preliminary injunction factors in turn.

### III.    Likelihood of Success on the Merits

The First Amendment, as applied to the states by the Fourteenth Amendment, guarantees that "Congress shall make no law . . . abridging the freedom of speech." U.S.

Const. amends. I, XIV; *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). In evaluating a First Amendment challenge to restrictions on speech on government property, courts apply a three-step test. The Court must: (1) determine whether the activity constitutes protected speech; (2) "identify the nature of the forum" in which the speech occurred "because the extent to which the Government may limit access depends on whether the forum is public or nonpublic"; and (3) "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

Here, the first two elements are undisputed. The parties agree that public comment at Board meetings is protected speech. *See City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 174–75 (1976). They likewise agree that the Board's monthly meetings constitute a limited public forum. *See Smith v. City of Middletown*, No. 3:09-cv-1431, 2011 WL 3859738, at *4 n.3 (D. Conn. Sept. 1, 2011) ("Where the parties agree that a forum is a limited public forum, the court may agree to this characterization."). The dispute therefore centers on the third step: whether Policy BEDH conforms to the constitutional limits that apply in a limited public forum. As this Court has previously explained, a "limited public forum is what it sounds like—a forum that has been opened to the public but is 'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'" *McBreairty*, 2024 WL 2187436, at *6 (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010)). In that setting, the Government can impose generally applicable time, manner, and place restrictions that are unrelated to the speech's content as long as the restrictions are narrowly tailored to serve a compelling government interest and leave open ample alternative channels of communication. *See McCullen v. Coakley*,

573 U.S. 464, 477 (2014). Furthermore, content-based restrictions may be permissible when they "preserve[] the purposes of that limited forum." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). Viewpoint discrimination, however, is another matter. Viewpoint discrimination is "presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 820; *see Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (explaining the state may reserve a forum for its intended purposes if its regulations are reasonable and "not an effort to suppress expression merely because public officials oppose the speaker's view").

Applying these principles, two core requirements emerge for Policy BEDH's constitutionality. In a limited-public forum, content-based restrictions may be valid only if they are both (1) viewpoint neutral; and (2) reasonable considering the forum's purpose. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001). The Court therefore considers whether Policy BEDH (1) is viewpoint neutral, and (2) imposes only reasonable limits given the function of the Board's public comment period. Beyond these requirements, a speech restriction may also be struck down as facially unconstitutional if it is substantially overbroad or impermissibly vague. The Court addresses each standard in turn.

Viewpoint neutrality requires the government to refrain from regulating speech based on "the specific motivating ideology or the opinion or perspective of the speaker" —which the Supreme Court has called "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. The constitutional violation is especially "blatant" when the government targets not the subject matter of speech, but the particular view expressed. *Id.* This protection extends beyond merely treating opposing sides of a debate equally. It also safeguards "the right to create and present arguments for positions

14

in particular ways, as the speaker chooses," *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring in part), even when that speech offends and is distasteful to others. After all, "[g]iving offense is a viewpoint." *Id*. at 243 (majority opinion); *see Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (describing "disfavoring ideas that offend" as viewpoint discrimination (quotation modified)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

Reasonableness, by contrast, looks not to the government's hostility toward a viewpoint, but to whether the restriction sensibly advances the forum's nature and purpose. *See Moms for Liberty–Brevard Cnty., FL v. Brevard Pub. Schs.*, 118 F.4th 1324, 1332 (11th Cir. 2024); *Cornelius*, 473 U.S. at 802–04. A content-based limitation in a limited public forum is constitutionally permissible if "it preserves the purposes of that limited forum." *Rosenberger*, 515 U.S. at 830. What counts as reasonable will therefore vary from forum to forum. Moreover, in a limited public forum, the speech restriction "need not be the most reasonable" or even "the only reasonable limitation." *Martinez*, 561 U.S. at 692. Even so, while "reasonableness is a forgiving test, it is not a blank check." *Moms for Liberty*, 118 F.4th at 1332 (quotation modified). The government must be able to "articulate some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018). And although some enforcement discretion is inevitable and necessary, too much unguided discretion in the hands of a government decision-maker can itself render a restriction facially unconstitutional. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129–30

15

(1992); *see also Minn. Voters All.*, 585 U.S. at 21 ("But that discretion must be guided by objective, workable standards.").

Even if a restriction satisfies the viewpoint neutrality and reasonableness requirements, however, it may still be facially unconstitutional under two additional doctrines. A speech restriction can be struck down if it is either substantially overbroad under the First Amendment or impermissibly vague under the Due Process Clause of the Fourteenth Amendment. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982); *United States v. Williams*, 553 U.S. 285, 304 (2008) (noting the vagueness doctrine stems from the Due Process Clause and not the First Amendment). Although overbreadth and vagueness are distinct doctrines, courts have "traditionally viewed" them "as logically related and similar." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983).

Under the overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292. The doctrine reflects concern that the threat of enforcement of an overbroad law will chill the exercise of First Amendment rights. *See Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493, 509 (1st Cir. 2021). For that reason, the Supreme Court has characterized the doctrine as "strong medicine" to be applied only as a last resort and has limited it to situations where the challenged regulation "prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292–93. As such, regulations that are "sweeping" or "incapable of limitation" and chill protected expression are more likely to be struck down as overbroad. *New York v. Ferber*, 458 U.S. 747, 772 (1982).

The vagueness doctrine serves a related but distinct function. Under the Due Process Clause of the Fourteenth Amendment, "laws which regulate persons or entities

must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). To that end, a law is impermissibly vague if it either fails to provide fair notice of what conduct is prohibited or invites arbitrary and discriminatory enforcement. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000). That said, a statute is not void for vagueness simply because its language is not "surgically precise." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011).

With these principles in mind—forum analysis, viewpoint neutrality, reasonableness, overbreadth, and vagueness—the Court turns to Policy BEDH's challenged provisions and their application to Mr. Blanchard's speech. The parties agree on the general proposition that a school board may adopt reasonable time, place, and manner rules to keep its meetings orderly and on track. The dispute is over the line those rules may not cross; whether, on its face and as applied, Policy BEDH goes beyond order and efficiency and impermissibly burdens Mr. Blanchard's First Amendment rights.

### A. Prohibition on Gossip, Defamatory Comments, and Abusive or Vulgar Language

Mr. Blanchard first brings facial and as-applied challenges to Rule E of Policy BEDH, which states that "[s]peakers are not permitted to share gossip, make defamatory comments, or use abusive or vulgar language." ECF No. 3 at 2. He argues Rule E's ban on "gossip," "defamatory comments," and "abusive or vulgar language" discriminates based on viewpoint and unreasonably determines the forum's purpose. He further asserts these terms are (1) impermissibly vague[3]—because they fail to give the public fair notice and

---

[3] While the Defendants also contend that Mr. Blanchard's vagueness challenge cannot be applied to Policy BEDH because the vagueness doctrine only applies "to provisions other than statutes, ordinances, and licensing schemes," this Court follows its earlier determination that, although this is "a fair point," because the Court lacks a "clearer directive [from the First Circuit] to forgo applying the vagueness inquiry to the school board meeting rules, [it will] proceed with the analysis." *McBreairty v. Miller*, No. 23-cv-00143, 2024 WL 2187436, at *9 n.4 (D. Me. May 15, 2024).

grant the Chair broad, unguided enforcement discretion—and (2) overbroad—because they sweep in substantial amounts of protected speech.

On the facial challenge, the Court begins with the text of Policy BEDH. *See, e.g.*, *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021). Policy BEDH does not itself define the challenged terms or offer any interpretive guidance. In such circumstances, courts often turn to ordinary usage to supply meaning, frequently consulting dictionaries to determine how a reasonable speaker would understand the language at issue. *See Easthampton Congregational Church v. Church Mut. Ins. Co.*, 916 F.3d 86, 92 (1st Cir. 2019). Moreover, the Court may look "to some degree[] to the interpretation of the statute given by those charged with enforcing it" to discern its "allowable meaning." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

### 1.  *Gossip*

The Court starts with Mr. Blanchard's facial challenges to Policy BEDH's prohibition on "gossip." Policy BEDH does not define the term gossip. Merriam-Webster defines "gossip" as "rumors or information about the behavior or personal lives of other people." *See Gossip*, Merriam-Webster, https://www.merriam-webster.com/dictionary/gossip. Accordingly, the Court uses this ordinary meaning as the backdrop for its analysis on the constitutionality of the Policy prohibiting "gossip."

Defendants maintain gossip falls outside of Policy BEDH's allowable requirement that public comment be limited to "school or education matters," and that banning gossip is not a content-based restriction. Defendants also contend the gossip prohibition is viewpoint neutral because it does not turn on the speaker's ideology but instead targets a mode of expression and personally directed attacks. But "a law may be content-based even if it's viewpoint-neutral." Eugene Volokh, *The First Amendment and Related Statutes* 361

(5th ed. 2014).   A rule is content based if it applies "based on the content of speech" rather than "to all speech irrespective of content." *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980) (quotation modified); *see Planet Aid v. City of St. Johns, MI*, 782 F.3d 318, 327–28 (6th Cir. 2015) (collecting Supreme Court cases ruling on whether certain regulations are content based or content neutral).

By its terms, the gossip prohibition turns on what is being said: "rumors or information about the behavior or personal lives of other people." *See Gossip*, Merriam-Webster. Such a category of speech does not exist solely and definitively outside of that which relates to school or education matters. Comments about the conduct or personal behavior of teachers, administrators, or Board members may indeed bear directly on school operations and policy. Thus, whether a speaker has engaged in "gossip" depends on the content of the speech, not some neutral feature like time or manner. As a result, the ban is content based and is constitutional only if it remains viewpoint neutral and reasonable in light of the forum's purpose.

On those measures, Rule E's gossip prohibition fares poorly. Policy BEDH provides no objective standard to distinguish "gossip" related to school and education matters from other such commentary. That lack of clarity leaves speakers guessing at what is allowed and invites arbitrary enforcement by officials presiding over the meetings. Without a workable line, there is no "sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters All.*, 585 U.S. at 16. In practice, the rule allows the presiding officer's own sensibilities to determine what counts as "gossip," which "openly invites viewpoint discrimination." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021).

The overbreadth concerns are equally apparent. Defined as "rumors or information about the behavior or personal lives of other people," the term "gossip" can

19

easily encompass speech at the heart of the Board's public comment period—for example, a parent repeating information they have heard about a teacher's behavior in the school that relates to their child's education or a citizen relaying information about an administrator's conduct relevant to policy or budgeting decisions. Such speech may be sharply worded but still fully protected and directly tied to school business. A rule that sweeps this speech broadly into the category of "gossip" risks silencing criticism that the First Amendment protects.

In light of the term's content-based character, its subjective and standardless application, and its tendency to capture substantial protected speech, the Court concludes that Mr. Blanchard is substantially likely to succeed on his facial challenge to the "gossip" provision of Rule E.

## 2. Defamatory Comments

Next, Mr. Blanchard asserts a facial challenge to Rule E's prohibition on defamatory comments. "Defamation" means "the act of communicating false statements about a person that injure the reputation of that person." *See Defamation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/defamatory.  At the July 2025 Board meeting, the Chair similarly described a "defamatory statement" as "one that can injure one's reputation." ECF No. 18-1 at 16. Defamation also has a settled legal meaning and falls within a "well-defined and narrowly limited" category of speech that the government may proscribe without raising a constitutional problem. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942)); *see Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245–46 (2002) (noting the Constitution "does not embrace certain categories of speech, including defamation").

20

Because defamation lies outside the First Amendment's protection, a narrow rule that bars defamatory statements does not offend the Constitution. *See, e.g.*, *Felton v. Griffin*, 185 F. App'x 700, 701–02 (9th Cir. 2006) (upholding rule barring slander in city council decorum rules for public meeting as a permissible restriction on unprotected speech). On the present record, the Court can reasonably construe Policy BEDH's "defamatory comments" language to track that unprotected category, rather than to create some broader, free-floating ban on criticism as Mr. Blanchard posits. Under that construction, Mr. Blanchard is not substantially likely to succeed on his facial challenge to the "defamatory comments" provision of Rule E.

### 3. Abusive or Vulgar Language

Finally, Mr. Blanchard brings a facial challenge to Rule E's prohibition on "abusive or vulgar language." Because Rule E is written in the disjunctive, it restricts both abusive and vulgar speech, and the text suggests each term carries its own distinct meaning. *See FCC v. Pacifica Found.*, 438 U.S. 726, 739–40 (1978). The Court therefore considers each term in the context of the rule as a whole. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) ("Courts have a duty to construe statutes, not isolated provisions." (quotation modified)). As with the other Rule E terms, Policy BEDH does not define abusive or vulgar.

Merriam Webster defines "abusive" as "harsh and insulting" or "using harsh and insulting language." *See Abusive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/abusive. At the July 2025 Board meeting, the Chair similarly defined abusive language as "language that is harmful or offensive to a person." ECF No. 18-1 at 16. Read this way, the policy singles out speech that offends or insults its target. This is classic viewpoint discrimination. *See Matal v. Tam*, 582 U.S. 218, 243 (2017)

("Giving offense is a viewpoint."). Other courts evaluating comparable school board policies have reached the same conclusion. *See, e.g.*, *Ison*, 3 F.4th at 893–94 (finding school board policy prohibiting "antagonistic" and "abusive" speech constituted facially impermissible viewpoint discrimination); *Marshall*, 571 F. Supp. 3d at 423–25 (ban on "abusive" and "offensive" comments was viewpoint-based and facially unconstitutional); *Moms for Liberty*, 118 F.4th at 1335 (holding the school board's policy on "abusive" speech was "facially unconstitutional").

To be sure, the Board is not powerless to regulate all manifestations of abusive speech. A policy that targets narrow, viewpoint-neutral characteristics—such as actual disruption, shouting, threats, or true harassment—or that explicitly and tightly defines the covered category may pass constitutional muster. *See, e.g.*, *Moms for Liberty*, 118 F.4th at 1335 (noting a more narrowly drawn policy could be valid); *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1357 (N.D. Ga. 2022) ("[T]he fact that the Board cannot outright prohibit abusive speech that is simply critical or offensive does not mean that it cannot restrict certain sub-categories of that type of speech, such as hateful racial epithets."); *Hunt v. City of L.A.*, No. CV 12-7261, 2012 WL 12548355, at *6 (C.D. Cal. Dec. 6, 2012) (sustaining an "abusive" language ban narrowed to disruptive conduct). Rule E, however, does not contain that kind of limiting construction. As applied here, "abusive" functions as a broad bar on offensive speech—an "undercover prohibition" on disfavored viewpoints. *Moms for Liberty*, 118 F.4th at 1335.

Because the government "may not burden the speech of others in order to tilt public debate in a preferred direction," *id.* (quotation modified), the Board's prohibition on "abusive" language is facially unconstitutional in this limited public forum. Mr.

22

Blanchard is therefore likely to succeed on his facial challenge to the "abusive language" portion of Rule E.

The ban on vulgar language presents a closer question. Merriam-Webster defines "vulgar" in several ways, including "lacking in cultivation, perception, or taste," "offensive in language," and "of or relating to the common people." *See Vulgar*, Merriam-Webster, https://www.merriam-webster.com/dictionary/vulgar. In the context of Policy BEDH, which prohibits "abusive or vulgar language" without reference to sexual content or obscenity, the most natural reading is "offensive in language." *See Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 164 (4th Cir. 2025) ("And, as the Supreme Court has recognized, the plain meaning of vulgar is different—and broader—than the constitutional meaning of obscene."); *Miller v. California*, 413 U.S. 15, 36 (1973) (obscenity is not protected by the First Amendment). That understanding again steers the analysis toward viewpoint discrimination, because the rule targets speech for its perceived offensiveness rather than for its subject or disruptive effect.

The Supreme Court has recognized that schools may regulate certain vulgar student speech in the school setting. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). The Court understands the school board's desire to model respectful public behavior and to encourage civil discourse. Nonetheless, public school board meetings— open to adults and structured as a limited public forum—differ meaningfully from compulsory K–12 classrooms where the First Amendment permits greater regulation. *See Mama Bears*, 642 F. Supp. 3d at 1355 (noting a school board meeting is "much more analogous to a courthouse than it is to a school full of minors, from a First Amendment perspective"); *see also Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) (recognizing a courthouse as a nonpublic forum). In this setting*,* courts have instead focused on

23

whether boards may exclude speech that is truly obscene or actually disruptive. *See Mama Bears*, 642 F. Supp. 3d at 1356–57.

Other decisions further illustrate the distinction. *Mama Bears* upheld restrictions on narrow subcategories of abusive speech, such as hateful racial epithets, but emphasized that boards may not categorically prohibit speech "that is simply critical or offensive." *Id*. at 1357. And while the Seventh Circuit in *Milestone v. City of Monroe* declined to invalidate a senior center code of conduct that barred "abusive, vulgar, or demeaning language," it did so in a different context—a municipally-run senior center whose purpose was social programming, not a public comment period directed at elected officials in a limited public forum. 665 F.3d 774, 783 (7th Cir. 2011). The forum here more closely resembles the settings in *Ison*, *Marshall*, and *Moms for Liberty*, where courts struck down school-board rules that vested officials with broad authority to police "offensive" or "abusive" speech by citizens criticizing government actors.

Nor is there a persuasive narrowing construction available on this record that would confine "vulgar" to unprotected obscenity or similar categories. Rule E does not use the word "obscene," does not tie "vulgar" to any requirement of disruption, and does not otherwise limit the term to a recognized class of unprotected speech. Instead, particularly when read alongside "abusive," Rule E leaves policing "vulgar" to turn on the presiding officer's sense of what language is sufficiently "uncultivated" or "offensive in language" to warrant exclusion. Such open-ended discretion raises the same concerns identified in *Minnesota Voters Alliance*, where the Supreme Court cautioned that standardless rules invite arbitrary enforcement. 585 U.S. at 16–17.

For these reasons, the term "vulgar" in Rule E can only be understood as a broad prohibition on offensive language that operates as an additional restriction on offensive

24

viewpoints rather than as a legitimate, viewpoint-neutral decorum rule. *See Moms for Liberty*, 118 F.4th at 1335. In line with the Court's analysis of "abusive" speech, the "vulgar language" prohibition is facially unconstitutional, and Mr. Blanchard is likely to succeed on his facial challenge to that portion of Rule E.

Accordingly, the Court concludes that Mr. Blanchard is substantially likely to succeed on his facial challenge to Rule E's bans on "gossip," "abusive" language, and "vulgar" language, and the Court will enjoin those provisions. By contrast, on the present record, he is not substantially likely to succeed on his facial challenge to Rule E's prohibition on "defamatory comments," which the Court construes as limited to unprotected defamatory speech, and the Court declines to enjoin that provision. Where Mr. Blanchard's facial challenge succeeds, the Court need not separately address his as-applied challenge to those same portions of Rule E.[4] *See, e.g.*, *Mama Bears*, 642 F. Supp.

---

[4] The record reflects one instance in which the Chair referenced defamation when interruption Mr. Blanchard's remarks:

> Mr. Blanchard: " . . . shame on the one board member that voted no."
>
> Chair: "I am sorry, but negative comments will not be allowed."
>
> Mr. Blanchard: ". . . This petition is asking if you, the school board members, will put up a vote to have Ms. Kim . . ."
>
> Chair: "I'm sorry, that's not going to be tolerated . . . I am going to ask you to step from the podium. That's the second warning I'm going to give you about making defamatory remarks about school personnel."
>
> Mr. Blanchard: "How is that defamatory remarks?"
>
> The Chair: "I don't have to explain it to you."
>
> Mr. Blanchard: "So, you're just going to make claims . . . and just . . . ."
>
> The Chair: "I'm not going to allow you to speak to school personnel in any way."

*See* ECF No. 18-1 at 9; April Meeting at 46:38–47:38 (lightly edited for clarity). While the chair invokes defamation, her ultimate justification was a broader refusal to allow any comments about school personnel, consistent with Rule H's interpretation, and she ended Mr. Blanchard's remarks on that basis. This isolated incident does not, at this stage, persuade the Court that Mr. Blanchard is substantially likely to succeed on his as-applied challenge to the "defamatory comments" provision in Rule E.

3d at 1351 (analyzing merits of preliminary injunction in First Amendment context and declining to address as-applied challenge where plaintiff's facial challenge to same policy provision was successful).

To the extent Mr. Blanchard presses an as-applied challenge directed specifically at Rule E's ban on defamatory comments, the current record does not demonstrate that this provision, as such, has been enforced against him in a constitutionally impermissible manner. Having determined that Mr. Blanchard is likely to prevail in part on his facial challenge to Rule E, the Court next examines the merits of his First Amendment challenge to Rule H.

## B.  Prohibition on Complaints or Allegations and Personal Matters or Complaints

Mr. Blanchard also brings facial and as-applied challenges to Rule H of Policy BEDH, which provides: "No complaints or allegations will be allowed at Board meetings concerning any person employed by the school system or against particular students. Personal matters or complaints concerning student or staff issues will not be considered in a public meeting but will be referred through established policies and procedures." ECF No. 3 at 2.

Because a proper facial analysis begins with the scope of the challenged provision, the Court starts by examining the reach of Rule H. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024). Defendants contend Rule H "restricts speakers from discussing a named or identifiable District employee regardless of whether the comment associated with that individual employee is criticism, praise, or something in between." ECF No. 18 at 10. Read that way, Rule H would operate as a ban on "personnel matters." A content-based restriction that excludes an entire subject—such as personnel matters—may be

permissible in a limited public forum if it is viewpoint neutral (for example, barring all personnel-related comments, positive and negative) and reasonable (for example, by providing effective alternative channels for addressing those matters, such as through Policy KE). *See, e.g.*, *McBreairty*, 2024 WL 2187436, at *2 (declining to enjoin ban on discussing "personnel matters" defined as "any discussion, whether positive or negative, of job performance or conduct of a school unit employee"); *see also Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010); *Cipolla-Dennis v. Cnty. of Tompkins*, No. 21-712, 2022 WL 1237960, at *2 (2d Cir. Apr. 27, 2022).

Rule H, however, does not use the term "personnel." Instead, it refers to "*personal* matters or complaints concerning student or staff issues." ECF No. 3 at 2 (emphasis added). That wording presents distinct issues. "Personal" is commonly defined as "of, relating to, or affecting a particular person" and "relating to an individual or an individual's character, conduct, motives, or private affairs often in an offensive manner." *See Personal*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/ personal. Synonyms for "personal" include "subjective," "personalized," "private," and "individual." By contrast, "personnel" refers to "a body of persons usually employed" in an organization. *See Personnel*, Merriam-Webster, https://www.merriam-webster.com/dictionary/personnel. Synonyms listed for personnel include "staff," "manpower," and "workforce." As Merriam-Webster notes, "personal" and "personnel" are distinct terms, and confusion often arises where either might appear plausible—such as "personal matter" versus "personnel matter." That distinction matters here. If the policy is meant to exclude "personnel matters," it does not say so. *Cf. McBreairty*, 2024 WL 2187436, at *9 (finding that a prohibition on "discussion of personnel matters" was

27

not inherently vague because the policy "provide[d] a definition of what is meant by 'discussion of a personnel matter'").

The ambiguity in Rule H's actual language drives the constitutional problem. It is not clear what "personal matters" encapsulates. If the phrase is meant to exclude speech related to purely private affairs—thereby removing it from the ambit of speech that relates to education and the school system—that limitation is not evident from the text alone. And in light of the forum's purpose, some purely "private matters" would already reasonably fall outside the permissible scope of discussion. But the definition of "personal" also relates to an individual's "conduct," "character," or "motives," and these words are vague in the context of Policy BEDH. Thus, while the Constitution does not require mathematical exactitude in language, the text of Rule H alone makes it unclear what speech it allows and what it prohibits. *See Grayned*, 408 U.S. at 110.

That uncertainty is reinforced, not resolved, when Rule H is read in the context of Policy BEDH as a whole. Under the rule against surplusage, courts construe regulations so that "no clause, sentence, or word shall be superfluous, void, or insignificant." *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 7 (1st Cir. 2022) (internal citation omitted). Because Policy BEDH is already limited to speech that relates to "matters concerning education and the Augusta Board of Education schools," ECF No. 3 at 1, reading "personal matters" to mean only "private affairs" goes against favoring an interpretation that gives "every word and every provision" some independent operation within the Policy. *Consumer Data Indus. Ass'n*, 26 F.4th at 7 (internal citation omitted). The more plausible construction of Rule H is that "personal matters" extends to speech about an individual's "conduct," "character," or "motives" in connection with school

matters—an interpretation that risks prohibiting protected speech for the reasons discussed.

The Board's shifting explanations of Rule H have not cured this uncertainty. Although the Court may look "to some degree[] to the interpretation of the statute given by those charged with enforcing it" to discern its "allowable meaning," *Grayned*, 408 U.S. at 110, the record reflects inconsistency rather than clarification. At the April 2025 meeting, the Chair suggested that "negative comments" about Board members were not permitted, even though Defendants later conceded at the hearing that Rule H does not bar speech directed at Board members, only at school employees. At the May 2025 meeting, a Board member stated that "the policy is that we will not speak positively or negatively about any personnel," and the Chair responded, "our current policy is only to not speak negatively."[5] May Meeting at 2:05:00–2:10:15. At the hearing, Defendants framed this exchange as two Board members talking past each other about different provisions (Rules E and H) and argued that Rule H is a viewpoint-neutral regulation targeting identifiable school personnel. The Court is not persuaded that this post hoc framing supplies a valid limiting construction for Rule H; in any event, it does not resolve the underlying constitutional concerns.

The vagueness doctrine "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes" and "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions" of

---

[5] The record reflects a single instance in which a speaker was allowed to praise a school employee by name after that employee received an award and was listed on the meeting agenda in connection with that recognition. But "[o]ne cheeky comment in isolation, without a showing that individuals were in fact permitted to discuss favorable personnel matters, is not enough to transform a facially viewpoint-neutral restriction into a viewpoint-based restriction." *Pollak v. Wilson*, No. 22-CV-49, 2022 WL 17985919, at *2 (D. Wyo. Apr. 26, 2022).

government officials. *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018). Rule H, as written, falls short on both fronts. The phrase "personal matters or complaints concerning student or staff issues" is steeped in subjectivity,[6] and the record shows that Board members and the Chair have articulated different understandings of what the rule covers. Because the text does not clearly delineate its boundaries and the interpretive explanations have been inconsistent, Defendants have not shown that Rule H is capable of "reasoned application." *Minn. Voters All.*, 585 U.S. at 23.

Accordingly, the Court concludes that Mr. Blanchard is substantially likely to succeed on his facial challenge to Rule H.[7] In light of that conclusion at the preliminary-injunction stage, the Court need not address his as-applied challenge.

### IV.    Irreparable Harm

Mr. Blanchard must next show risk of irreparable harm in the absence of an injunction. Courts assess irreparable harm on a sliding scale "in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010) (quotation modified). Mr. Blanchard contends he has already suffered, and will continue to suffer, irreparable harm because the Board has penalized him for engaging in protected speech and he self-censors to avoid further enforcement of Policy BEDH. *See* ECF No. 2 at 17. Defendants respond that there is no such risk because Mr. Blanchard has

---

[6] That is not to say the Board could not draft a public comment policy with a clear definition of "personal matters" that is appropriately prohibitive.

[7] Notably, Rule H, by its terms, applies only to "complaints or allegations" and "complaints concerning student or staff issues." For the reasons discussed herein, restricting only "complaints" is not viewpoint neutral. However, the Court need not address this issue further because it has enjoined Rule H in its entirety.

continued to speak at various Board meetings, and they characterize his request as an effort to change, rather than preserve, the status quo. ECF No. 18 at 29. Defendants further aver Mr. Blanchard can communicate his concerns and criticisms, but he wishes to do so in a way that violates Policy BEDH. *Id.*

The Supreme Court has long recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the First Circuit, when a plaintiff has "made a strong showing of likelihood of success on the merits of [his] First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Fortuño*, 699 F.3d at 15. Here, for the reasons already explained, Mr. Blanchard has made such a showing with respect to his facial First Amendment challenges to portions of Rules E and H. The risk that he will continue to curtail his speech to avoid removal or interruption at future meetings is enough to establish irreparable harm. Accordingly, Mr. Blanchard has demonstrated a likelihood of irreparable injury absent injunctive relief.

## V.    Balance of Equities and Public Interest

Finally, Mr. Blanchard must demonstrate that "the balance of equities tips in his favor" and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the Government is the opposing party, these two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Does 1–6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). In weighing the equities, the Court considers the intrusion on Mr. Blanchard's speech rights against the harms Defendants assert will follow if Policy BEDH is enjoined, and takes into account the interests of the public at large. *See Barnes v. E-*

31

*Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers).

Mr. Blanchard argues enjoining policies that infringe First Amendment rights is inherently in the public interest and injunctive relief is necessary to prevent further constitutional injury. ECF No. 2 at 18. Defendants counter an injunction will open the door to personal attacks on school employees by name, including abusive or disruptive speech, and will undermine the Board's ability to protect its staff or maintain a safe working environment. ECF No. 18 at 29. They also predict escalating disruptions and declining decorum that will hinder the Board's ability to complete its agenda. *Id.* The Court does not discount these concerns and recognizes, as it has before, that "civil discourse has increasingly become more rancorous throughout our country." *McBreairty v. Sch. Bd. of RSU 22*, 616 F. Supp. 3d 79, 98 (D. Me. 2022). On the present record, however, Defendants have not demonstrated that an injunction would materially prevent the Board from accomplishing its scheduled business or ensuring that all members of the public have a meaningful opportunity to speak.

As discussed, Mr. Blanchard has made a strong showing that he is likely to succeed on the merits of his facial challenge to Rule H and, in part, Rule E, and he has established irreparable harm. Defendants have a legitimate interest in conducting efficient meetings and promoting a fair, orderly process, but that interest does not justify policies that, as written and applied, impermissibly burden protected speech. After all, "[p]rotecting rights to free speech is ipso facto in the interest of the general public." *Cutting v. City of Portland*, No. 13-cv-359, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014), *aff'd*, 802 F.3d 79 (1st Cir. 2015) (quotation modified). On this record, the weight of the equities and the public interest favor preventing ongoing infringement of First Amendment rights, subject

32

to the injunction described below. The balance of equities and public interest therefore tip in favor of granting the preliminary injunction. The Court remains hopeful that, going forward, public school board meetings can be conducted in a manner that both honors the guarantees of the First Amendment and preserves the civility essential to democratic governance, and that demonstrates that respectful and constructive discourse remains possible for all.

## BOND REQUIREMENT

Because the Court grants preliminary injunctive relief, it must also determine whether to require a security bond. Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The First Circuit, however, has recognized an exception to this bond requirement where important federal rights or public interests are at stake. *See Crowley v. Loc. No. 82, Furniture & Piano Moving*, 679 F.2d 978, 999–1000 (1st Cir. 1982) (collecting cases), *rev'd on other grounds*, 467 U.S. 526 (1984); *see also Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 237 (D. Me. 2025). Moreover, the decision whether to require security—and in what amount—falls within the Court's "substantial discretion." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991). Here, Mr. Blanchard asks the Court to waive the security requirement on the ground that compliance with the injunction will not cause Defendants to suffer monetary or non-monetary harm. ECF No. 2 at 25. Defendants have not offered any argument in favor of a bond. Given that this case involves the protection of First Amendment rights and Defendants have not identified any compensable harm

they would suffer if Policy BEDH were wrongfully enjoined, the Court exercises its discretion to require no security interest.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Mr. Blanchard's motion for a preliminary injunction. ECF No. 2. The Court **GRANTS** the motion as to Rule E's ban on "gossip," "abusive" language, and "vulgar" language; **GRANTS** the motion as to Rule H in its entirety; and **GRANTS** the motion as to Rule J solely as it relates to the Chair enforcing the portions of Policy BEDH herein enjoined. The Court **DENIES** the motion as to Rule E's ban on "defamatory comments." Accordingly, Defendants are **ENJOINED** from enforcing the following provisions of Policy BEDH: Rule E's prohibition on "gossip," "abusive" language, and "vulgar" language; and Rule H in its entirety. Defendants are also **ENJOINED** from enforcing Rule J to the extent that its application is inconsistent with this Order and the constitutional rights identified herein. All remaining provisions of Policy BEDH, including Rule E's prohibition on "defamatory comments," may continue to be enforced consistent with this Order.

**SO ORDERED.**

Dated this 27th day of April, 2026.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**
